[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. McCann v. Delaware Cty. Bd. of Elections,* Slip Opinion No. 2018-Ohio-3342.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-3342

THE STATE EX REL. MCCANN ET AL. *v.* DELAWARE COUNTY BOARD OF ELECTIONS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. McCann v. Delaware Cty. Bd. of Elections, Slip Opinion No. 2018-Ohio-3342.*]

*Elections—Prohibition—Writ of prohibition sought to prevent board of elections from placing township zoning referendum on the ballot—R.C. 519.12(H)— R.C. 3501.38(E)(1)—Writ granted.*

(No. 2018-1037—Submitted August 15, 2018—Decided August 21, 2018.)

IN PROHIBITION.

_____

**Per Curiam.**

**I. INTRODUCTION**

{¶ 1} In this expedited elections case, relators, Norma J. McCann and James E. Wheeler ("the protestors"), seek a writ of prohibition to prevent respondent, Delaware County Board of Elections ("the board"), from placing a township zoning

referendum on the November 2018 ballot.  We grant the writ because on one of the part-petitions, a person other than the circulator indicated the number of signatures that the circulator had witnessed, invalidating the part-petition, and without the signatures on that part-petition, the referendum petition lacks sufficient signatures for placement on the ballot.

## II. FACTS

### A. The Zoning Amendment and the Referendum Petition

{¶ 2} In March 2018, the Harlem Township Board of Trustees approved John D. McCann's request to rezone 13.28 acres from "agricultural residential" to "planned commercial district."  A group of township residents circulated a petition for a township zoning referendum requesting that the trustees submit the zoning change to the voters of the township in the November 2018 general election.  On April 18, the petitioners submitted the petition to the trustees.  On April 25, the trustees certified the petition to the board to determine its sufficiency and validity in accordance with R.C. 519.12(H).

{¶ 3} The petition included 12 or 13 part-petitions (depending on how they are counted); the board numbered them 1 through 13.  The petitioners used the secretary of state's two-page form 6-O.  The form's first page contains spaces to include information about the proposed zoning amendment and requested referendum, plus 4 signature lines, numbered 1 through 4.  The second page contains 14 additional signature lines, numbered 5 through 18, a circulator statement, and a space for the township fiscal officer to acknowledge receipt of the part-petition.  The circulator statement contains a blank for the circulator to write in the number of signatures he witnessed:

I, [printed name of circulator], declare under penalty of election falsification that I reside at the address appearing below my signature;  that I am the circulator of the foregoing petition

2

containing *[number]* signatures; that I witnessed the affixing of every signature; that all signers were to the best of my knowledge and belief qualified to sign; and that every signature is to the best of my knowledge and belief the signature of the person whose signature it purports to be or of an attorney in fact acting pursuant to section 3501.382 of the Revised Code.

[signature of circulator]

Most of the submitted part-petitions consisted of the form's two pages, but three part-petitions contained three pages: part-petition No. 1, part-petition No. 2, and a grouping of pages that the board labeled part-petition Nos. 11 and 12.

### *1. Part-petition No. 1*

**{¶ 4}** Part-petition No. 1 consisted of one form–6-O first page and two form–6-O second pages. The 4 signature lines on the first page were marked out with an "X," and no signatures appeared on that page. The 14 signature lines on the second page were renumbered to begin at 1, and the page contained 13 signatures. In the blank in the circulator statement for the number of signatures was written "13 of 16," in two different colors of ink. The signature lines on the third page were renumbered to begin at 14, and the page contained 3 signatures. The blank in the circulator statement for the number of signatures had a number written in black ink that had been scribbled out in blue ink. Another number was written next to that in blue ink, but that number had also been scribbled out. Finally, in the margin, in blue ink, was written "16 total."

### *2. Part-petition No. 2*

**{¶ 5}** Part-petition No. 2 also contained one form–6-O first page and two form–6-O second pages. As with part-petition No. 1, the signature lines on its first page were marked out with an "X" and contained no signatures and the 14 signature lines on its second page were renumbered to begin at 1. The second page contained

14 signatures, and in the blank in the circulator statement for the number of signatures was written, in black ink, "pg 1 of 2," with "28 total" written in the margin. The signature lines on the third page were renumbered to begin at 15, and the page contained 14 signatures. In the blank in the circulator statement for the number of signatures was written, in blue ink, "28." All the circulator statements in part-petition Nos. 1 and 2 were signed by Herman E. Berk Jr.

### 3. Part-petition Nos. 11 and 12

{¶ 6} Part-petition Nos. 11 and 12 were a grouping of three pages made up of two form–6-O first pages and one form–6-O second page. The first page contained 4 signatures. The signature lines on the second page were renumbered to begin at 5, and the page contained 2 signatures. Those on the third page were renumbered to begin at 7, and the page contained 2 more signatures. In the blank in the circulator statement for the number of signatures the number "8" was written, and the circulator statement was signed by Juanita Berk.

### B. The Certification of the Petition to the Ballot

{¶ 7} The referendum petition needed 116 valid signatures to qualify for the ballot. The petitioners submitted 183 signatures, and the board's staff initially verified 146 of them. However, according to its May 24, 2018 meeting minutes, the board then rejected part-petition No. 1 because "of the dual [circulator] statements and the confusion they inspire." The board accepted part-petition No. 2 though, because "the two circulator's statements are consistent." The board rejected part-petition Nos. 11 and 12 without stating a reason. And it rejected part-petition No. 13 because its pages had not been affixed together in any way when submitted. The board found that without the rejected part-petitions, the petition had 127 valid signatures—11 more than necessary—and on May 24, the board certified the referendum to the November 2018 ballot.

4

### C. The Protest and this Prohibition Action

{¶ 8} On June 8, the protestors filed with the board their protest against the petition, arguing that the board should have also rejected part-petition No. 2 due to several purported defects and that it should have rejected the entire petition because the part-petitions were affixed together with paperclips, rather than staples, in contravention of board policy. The board held a hearing on the protest on July 17.

{¶ 9} At the hearing, Herman Berk testified that he signed both circulator statements on part-petition No. 2 immediately after the last elector signed each page but that when he signed the statements, he left the space for the number of signatures witnessed blank. He later met with Bonnie Perry, a fellow circulator, and they sat beside each other and each counted the signatures on his part-petition, because Berk wanted Perry to make sure he was counting correctly. Both counted 28 signatures, and in Berk's presence, with his knowledge and permission, Perry wrote "pg 1 of 2," "28 total," and "28" in the blanks. Perry's testimony matched Berk's. She stated that she had made no edits to any of Berk's petition papers; she wrote only the number of signatures that he and she had agreed on. After the circulator statements were completed, Berk gave his part-petition to Perry. Perry collected all 13 part-petitions from the various circulators and then gave them to another person, who filed the petition with the trustees.

{¶ 10} At the conclusion of the hearing, the board unanimously denied the protest. The referendum remains certified to the ballot. The protestors filed this prohibition action on July 24. The following day, we granted their motion to expedite.

### III. ANALYSIS

{¶ 11} The protestors assert three grounds for a writ of prohibition: (1) that part-petition No. 2 had two circulator statements, (2) that part-petition No. 2's circulator did not indicate on the part-petition the number of signatures witnessed, and (3) that the part-petitions were paper-clipped together, not stapled as board

policy requires. Because we issue a writ based on the second ground, we do not address the remaining arguments.

### A. Legal Standards

#### 1. Prohibition

**{¶ 12}** To obtain a writ of prohibition, the protestors must show that (1) the board exercised quasi-judicial power, (2) the exercise of that power was unlawful, and (3) the protestors have no adequate remedy in the ordinary course of the law. *State ex rel. McCord v. Delaware Cty. Bd. of Elections*, 106 Ohio St.3d 346, 2005-Ohio-4758, 835 N.E.2d 336, ¶ 27. The board exercised quasi-judicial power when it denied the protest after a hearing that included sworn testimony. *See id*. at ¶ 28. And due to the proximity of the election, the protestors lack an adequate remedy at law. *Id*. at ¶ 29. The question is, then, whether the protestors have shown that the board engaged in fraud or corruption; abused its discretion, i.e., acted in an unreasonable, arbitrary, or unconscionable fashion; or clearly disregarded applicable legal provisions. *Id*. at ¶ 30.

#### 2. Liberal Construction, Strict Compliance, Substantial Compliance

**{¶ 13}** "[R]eferendum provisions should be liberally construed to permit the exercise of the power." *S.I. Dev. & Constr., L.L.C. v. Medina Cty. Bd. of Elections*, 100 Ohio St.3d 272, 2003-Ohio-5791, 798 N.E.2d 587, ¶ 22. But once their requirements are determined, "the settled rule is that election laws are mandatory and require strict compliance and that substantial compliance is acceptable only when an election provision expressly states that it is." *State ex rel. Ditmars v. McSweeney*, 94 Ohio St.3d 472, 476, 764 N.E.2d 971 (2002).

#### 3. Referendum Statutes

**{¶ 14}** The applicable legal provisions are R.C. 519.12(H) and 3501.38(E). R.C. 519.12(H) provides that a township zoning amendment shall become effective 30 days after a board of township trustees approves it, unless within that time period the trustees receive a petition asking them to submit the amendment to the voters at

the next election and the petition is signed by a number of electors residing in the unincorporated areas of the township that is not less than 8 percent of the total votes cast for governor in the unincorporated areas of the township in the most recent gubernatorial election.

**{¶ 15}** R.C. 519.12(H) contains only a few strict requirements for township-zoning-referendum petitions. First, each part-petition "shall contain the number and the full and correct title, if any, of the zoning amendment resolution, motion, or application, furnishing the name by which the amendment is known and a brief summary of its contents." R.C. 519.12(H). Second, "each petition shall be governed by the rules specified in [R.C. 3501.38]." R.C. 519.12(H).

**{¶ 16}** R.C. 3501.38(E)(1), the subsection relevant here, states:

> On each petition paper, *the circulator shall indicate the number of signatures contained on it*, and *shall sign a statement* made under penalty of election falsification that the circulator witnessed the affixing of every signature, that all signers were to the best of the circulator's knowledge and belief qualified to sign, and that every signature is to the best of the circulator's knowledge and belief the signature of the person whose signature it purports to be or of an attorney in fact acting pursuant to [R.C. 3501.382].

(Emphasis added.) R.C. 519.12(H) provides that "[t]he form of a petition calling for a zoning referendum and the statement of the circulator shall be *substantially* as follows." (Emphasis added.) It then sets forth a sample form that incorporates a blank for the number of signatures witnessed into the circulator statement that is to be signed under penalty of election falsification. *Id.*

**{¶ 17}** R.C. 519.12(H)'s third strict requirement is that the petition "shall be filed with the board of township trustees and shall be accompanied by an appropriate map of the area affected by the zoning proposal."

### B. Indication of the Number of Signatures

**{¶ 18}** The protestors argue that the board abused its discretion and acted in clear disregard of the law by denying their protest against part-petition No. 2, because its circulator statements were modified by Perry after the circulator, Berk, signed them. We agree.

**{¶ 19}** R.C. 3501.38(E)(1) states: "[*T*]*he circulator* shall *indicate* the number of signatures contained on" each petition paper. (Emphasis added.) "The purpose of this requirement is to protect against signatures being added after the circulator's statement is made." *Rust v. Lucas Cty. Bd. of Elections*, 108 Ohio St.3d 139, 2005-Ohio-5795, 841 N.E.2d 766, ¶ 11 (denying writ of mandamus when board of elections had rejected part-petitions because they understated the number of signatures); *see also State ex rel. Loss v. Bd. of Elections of Lucas Cty.*, 29 Ohio St.2d 233, 233-234, 281 N.E.2d 186 (1972) (denying writ of mandamus when board of elections had rejected part-petition because space for indicating the number of signatures witnessed was left blank). R.C. 3501.38(E)(1) does not permit substantial compliance; the petitioners were required to strictly comply with it. *State ex rel. Commt. for the Referendum of Lorain Ordinance No. 77-01 v. Lorain Cty. Bd. of Elections*, 96 Ohio St.3d 308, 2002-Ohio-4194, 774 N.E.2d 239, ¶ 49.

**{¶ 20}** In addition, form 6-O incorporates the blank for the number of signatures witnessed into the circulator statement (as in R.C. 519.12(H)'s sample form) and instructs that the statement "[m]ust be *completed* and signed *by the circulator*." (Emphasis added.) This court has looked to the design of the secretary of state's forms to suggest the secretary's interpretation of statutes, to which this court typically gives "great deference." *State ex rel. Crowl v. Delaware Cty. Bd. of Elections*, 144 Ohio St.3d 346, 2015-Ohio-4097, 43 N.E.3d 406, ¶ 10. And the

secretary has admonished that "[t]he entire part-petition is invalid if the circulator's statement is not completed as required by law," Secretary of State Directive 2017-15, Section 1.02(G), Ohio Election Official Manual at 11-6.

{¶ 21} It is undisputed that here, the circulator, Herman Berk, was not the person who wrote in the number of signatures witnessed on part-petition No. 2. The part-petition therefore did not strictly comply with R.C. 3501.38(E)(1).

{¶ 22} The board makes a case for essentially deeming Perry's writing to be the act of Berk, because Perry wrote the number of signatures Berk had witnessed in Berk's presence, with Berk's knowledge, in response to Berk's request for assistance, and before the part-petition left Berk's possession and because R.C. 3501.38(E)(1) requires the circulator to "indicate" the number of signatures, not to "write" the number "in [his] own hand."

{¶ 23} However, even if R.C. 3501.38(E)(1), liberally construed, countenanced "indicat[ion]" of the number of signatures by Berk through Perry, the secretary's interpretation of the requirement on form 6-O is owed deference. And the board's argument that the secretary's interpretation should be read in the disjunctive, i.e., as setting forth one requirement that the circulator statement be "completed [by anyone]" and another that it be "signed by the circulator," strains credulity. The instruction clearly requires the circulator to both complete and sign the statement. Here, the circulator complied with only one of those requirements.[1]

{¶ 24} We conclude that the board abused its discretion by denying the protest as to part-petition No. 2. The rejection of part-petition No. 2 brings the number of valid signatures to 99. Because the petitioners did not submit at least 116 valid signatures, the referendum cannot proceed to the ballot.

---

[1] The board also suggests that the Americans with Disabilities Act may require it to accommodate a disabled circulator who is unable to complete the blank for the number of signatures witnessed on his or her own. However, that question is beyond the scope of the issues before the court, as no party has suggested that Berk was disabled and required an accommodation.

## IV. CONCLUSION

**{¶ 25}** For the foregoing reason, we grant a writ of prohibition and order the board to remove the referendum from the ballot. Because we grant the writ for this reason, we do not reach the protestors' remaining arguments.

Writ granted.

O'CONNOR, C.J., and O'DONNELL and DEGENARO, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion joined by FISCHER, J.

KENNEDY, J., dissents, with an opinion joined by FRENCH, J.

_____

**DEWINE, J., concurring in judgment only.**

**{¶ 26}** I agree with the lead opinion that part-petition No. 2 was not in compliance with the statutory requirement and, therefore, the referendum was not properly certified to the ballot. I write separately because rather than simply relying upon the plain language of the statute, the lead opinion largely premises its result on the "great deference" it gives to the secretary of state's interpretation of the statute, lead opinion at ¶ 20. In an appropriate case, we ought to take a hard look at our practice of deferring to statutory interpretations made by administrative agencies and nonjudicial officials. But this case can be decided without reaching the subject of deference.

**{¶ 27}** There are two problems with the lead opinion's approach. First, deference to the secretary's interpretation is unnecessary; the plain language of the statute is all we need to decide the case. Second, that deference is unwarranted; it is our job, not the secretary's, to issue final interpretations of the law.

**{¶ 28}** This court has said that " 'when faced with a problem of statutory construction, [it will] show[] great deference to the interpretation given the statute by the officers or agency charged with its administration.' " *State ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 155, 438 N.E.2d 120 (1982), quoting

*Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). In accord with this principle, we have deferred to the secretary of state's reasonable interpretation of the state's election laws. *See, e.g.*, *State ex rel. Lucas Cty. Republican Party Executive Commt. v. Brunner*, 125 Ohio St.3d 427, 2010-Ohio-1873, 928 N.E.2d 1072, ¶ 23.

{¶ 29} But here, the statute is clear: it requires the circulator to "indicate" the number of signatures. R.C. 3501.38(E)(1). It is uncontroverted that the circulator did not indicate the number of signatures; someone else did. There is no need to defer to the secretary's interpretation; the plain language of the statute is all we need to decide the case.

{¶ 30} Nevertheless, the lead opinion in large part premises its decision on the secretary's interpretation of the statute. Judicial deference to an agency's interpretation of a statute is at odds with the separation-of-powers principle that is central to our state and federal Constitutions. It has long been understood that part of the judicial power is to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803). The Ohio Constitution, like the federal Constitution, allocates power among three distinct branches of government. "The judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the supreme court as may from time to time be established by law." Ohio Constitution, Article IV, Section 1.

{¶ 31} Deference to an administrative agency's interpretation of the law, however, "wrests from Courts the ultimate interpretative authority to 'say what the law is,' * * * and hands it over to the Executive." *Michigan v. Environmental Protection Agency*, __ U.S. __, 135 S.Ct. 2699, 2712, 192 L.Ed.2d. 674 (2015) (Thomas, J., concurring), quoting *Marbury* at 177. In following this rule, we abandon our role as an independent check on the executive branch. *See Perez v. Mtge. Bankers Assn.*, __ U.S. __, 135 S.Ct. 1199, 1219, 191 L.Ed.2d 186 (2015)

(Thomas, J., concurring). In addition, judicial deference to administrative agencies on matters of legislative interpretation aggrandizes the power of the administrative state at the expense of the judiciary and officials directly accountable to the people. *See Arlington, Texas v. Fed. Communications Comm.*, 569 U.S. 290, 312-317, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (Roberts, C.J., dissenting).

{¶ 32} Although not as well developed, our practice of deferring to an administrative agency's statutory interpretations is similar to the doctrine applied in federal courts, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). (In some respects, our practice could be seen as more expansive than the doctrine that is applied in the federal courts because under *Chevron*, a statutory provision must be ambiguous before a court will defer to an agency's interpretation, *id*. As is evidenced by today's lead opinion, we have not consistently imposed that requirement.)

{¶ 33} The federal *Chevron* deference doctrine has come under severe and repeated criticism. *See, e.g.*, Christopher J. Walker, *Attacking* Auer *and* Chevron *Deference: A Literature Review*, 16 Geo.J.L. & Pub. Policy 103 (2018); Philip Hamburger, Chevron *Bias*, 84 Geo.Wash.L.Rev. 1187 (2016). And in recent years, the United States Supreme Court has pulled back on the reach of *Chevron* deference. In *King v. Burwell*, __ U.S. __, 135 S.Ct. 2480, 2488-2489, 192 L.Ed.2d 483 (2015), the court refused to apply the *Chevron* deference doctrine to a matter of "economic and political significance." And in *Michigan v. Environmental Protection Agency*, the court rejected the agency's interpretation as "stray[ing] far beyond" *Chevron*'s reasonable-interpretation standard. __ U.S. at __, 135 S.Ct. at 2706-2707. State courts have also recently taken a fresh look at their administrative-deference doctrines, with at least two states retreating from doctrines that afforded deference to agency interpretations of law. *Tetra Tech EC, Inc. v. Wisconsin Dept. of Revenue*, 382 Wis.2d 496, 2018 WI 75, 914 N.W.2d 21; *King v. Mississippi Military Dept.*, 245 So.3d 404 (Miss.2018).

{¶ 34} I share the above concerns that have been expressed about judicial deference to agency interpretations of laws. But this proceeding—an expedited elections matter with limited briefing and a quick turnaround—is not the appropriate one in which to give our administrative-deference practice the review it deserves. I look forward to a case that squarely puts the issue before us. As for this case, there is no need to get to deference; we ought to simply apply the statute as written.

FISCHER, J., concurs in the foregoing opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 35} A board of elections' obligation to ensure that a part-petition circulator strictly complied with R.C. 3501.38(E)(1) does not require it to apply the statute with a bent toward excluding petitions. Instead, the board must simply ensure that the circulator met the statute's actual requirements. Here, respondent, the Delaware County Board of Elections, did that. This court, on the other hand, inserts a court-made requirement that a circulator's indication of the number of signatures on a part-petition must be in his own hand. It's not enough for the majority that the circulator sign a statement "under penalty of election falsification" attesting to the number of signatures on the part-petition for a township zoning referendum. The majority's "in-his-own-hand" requirement is not part of a hypertechnical interpretation of the statute; instead, it's simply made up.

{¶ 36} The majority's focus in this case is on part-petition No. 2. The circulator of part-petition No. 2, Herman E. Berk Jr., had a duty to comply with the requirements of R.C. 3501.38(E)(1) in order for the part-petition to be valid. That statute reads:

On each petition paper, *the circulator shall indicate the number of signatures contained on it*, and *shall sign a statement*

made under penalty of election falsification that the circulator witnessed the affixing of every signature, that all signers were to the best of the circulator's knowledge and belief qualified to sign, and that every signature is to the best of the circulator's knowledge and belief the signature of the person whose signature it purports to be or of an attorney in fact acting pursuant to [R.C. 3501.382].

(Emphasis added.)  R.C. 3501.38(E)(1).

{¶ 37} I would hold that Berk's signed declaration attesting to—among other things—the number of signatures on the part-petition more than satisfies the requirement in R.C. 3501.38(E)(1) that the circulator "indicate the number of signatures contained on it."  Berk submitted the following circulator statement as a part of the part-petition in question:

I, Herman E. Berk Jr., declare under penalty of election falsification that I reside at the address appearing below my signature; that I am the circulator of the foregoing petition containing 28 signatures; that I witnessed the affixing of every signature; that all signers were to the best of my knowledge and belief qualified to sign; and that every signature is to the best of my knowledge and belief the signature of the person whose signature it purports to be or of an attorney in fact acting pursuant to section 3501.382 of the Revised Code.

Berk's signature follows the statement.  The statement is *Berk's* statement, signed by him, attesting to all the facts set forth in the statement "under penalty of election falsification," including the indication of the number of signers on the part-petition. That someone else physically filled in the blank regarding the number of signers is

immaterial. It is Berk who was attesting to the accuracy of that number in his statement. His statement begins with "I, Herman J. Berk Jr., declare" and ends with his signature, so it is Berk who was making all the declarations contained in between, including his indication of the number of signers.

{¶ 38} Looking back to the statute, all that it requires is that the circulator "*indicate* the number of signatures contained on it." (Emphasis added.) R.C. 3501.38(E)(1). It does not require that the "indicat[ion]" be in the circulator's own hand. What if Berk had asked someone to type in the number of signatures on the part-petition? Would that have invalidated the part-petition? How the number was physically registered on the piece of paper is not significant; the signed statement supporting that figure is what is important.

{¶ 39} Certainly, the definition of "indicate" does not require that the indication of a number must be written in one's own hand with a pen, or certified, or sworn to in the presence of a notary public. Because there is no definition of "indicate" in the statute, we look to its ordinary meaning: "to point out or point to or toward with more or less exactness: show or make known with a fair degree of certainty." *Webster's Third New International Dictionary* 1150 (2002).

{¶ 40} Did Berk "show or make known with a fair degree of certainty" the number of signers on the part-petition in his signed attestation? Of course he did. In fact, he went further than he need have: the requirement to "indicate the number of signatures contained on" the part-petition is not one of the items R.C. 3501.38(E)(1) requires to be a part of the "statement made under penalty of election falsification." The elements of that statement are "that the circulator witnessed the affixing of every signature, that all signers were to the best of the circulator's knowledge and belief qualified to sign, and that every signature is to the best of the circulator's knowledge and belief the signature of the person whose signature it purports to be or of an attorney in fact acting pursuant to [R.C. 3501.382]." R.C.

15

3501.38(E)(1). Berk did not just "indicate" the number of signatures on the part-petition; he attested to it in a signed statement under threat of election falsification.

{¶ 41} And in this case, we have undisputed testimony that the insertion of the number into the space for the number of signatures on the part-petition was witnessed and authorized by the circulator. Further, the indicated number of signatures, 28, never changed after Berk relinquished control of the part-petition. Berk and his scrivener, Bonnie Perry, each independently counted the number of signatures on the part-petition. Berk testified about their process: "Me and her went over them. I counted them, and Bonnie verified, right beside me, that they was all same." He testified that Perry filled in the number "[w]hile [he] was standing there." All this occurred in each other's company in Berk's home.

{¶ 42} Perry wrote the number of signatures Berk had witnessed in Berk's presence, with Berk's knowledge, in response to Berk's request for assistance, and before the part-petition left Berk's possession. There is absolutely no indication of the fraud R.C. 3501.38(E)(1) is designed to thwart.

{¶ 43} The exact order of signing the circulator statement and filling in the number of signatures on the part-petition is unimportant. Rather, that the number matches the number of signatures at the time of filing is what matters. R.C. 3501.38(G) contemplates that the number of signatures may change even after the circulator signs the circulator statement. R.C. 3501.38(G) provides that "[t]he circulator of a petition may, before filing it in a public office, strike from it any signature the circulator does not wish to present as a part of the petition." It follows that the indication of the number of signatures on the part-petition would have to be amended to match the true number of signatures. In that instance, the signature could precede the insertion of the correct number. R.C. 3501.38(G) establishes the time of "filing the [petition] in a public office" as the time when the R.C. 3501.38(E)(1) requirement to indicate the number of signatures on the part-petitions must be satisfied.

{¶ 44} The lead opinion, rather than interpret the statute itself, defers[2] to the secretary of state's supposed interpretation, which it claims is memorialized in a grammatically ambiguous sentence fragment that appears on petition form No. 6-O, which the secretary of state provides. Under the words "Circulator Statement" on that form appear the words "Must be completed and signed by the circulator."

{¶ 45} I do not believe that the secretary's admonition on the form rises to the level of statutory interpretation. Although the sentence fragment is unambiguous regarding who must sign the circulator statement—"signed by the circulator"—it is ambiguous regarding who must perform the completing—"must be completed." It does not say, for instance, "The circulator must complete and sign this statement." It leaves open for interpretation who must complete the statement and whether directing someone else to complete some information is tantamount to completing the statement oneself.

{¶ 46} If the secretary of state had intended the form to declare his interpretation of R.C. 3501.38(E)(1), he would have used one or more complete sentences to make his point clearly. As constructed, the sentence fragment does not grammatically mean that the blanks in the circulator statement must be completed by the circulator himself.

{¶ 47} The secretary had more space to declare a definitive interpretation of the statute in Directive 2017-15, which is incorporated as Chapter 11 of the Ohio Election Official Manual. Therein, he instructs:

---

[2] I will leave for another day the issue whether the judicial branch truly owes deference to administrative agencies' interpretations of statutes. *See, e.g., Pereira v. Sessions*, __ U.S. __, 138 S.Ct. 2105, 2120, __ L.Ed.2d __ (2018) (Kennedy, J., concurring) ("[I]t seems necessary and appropriate to reconsider, in an appropriate case, the premises that underlie *Chevron* [*U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)] and how courts have implemented that decision. The proper rules for interpreting statutes and determining agency jurisdiction and substantive agency powers should accord with constitutional separation-of-powers principles and the function and province of the Judiciary").

Prior to verifying the validity of individual signatures contained on a part-petition, the board of elections must verify the validity of that part-petition. Check each part-petition to determine whether the circulator's statement on the last page of the part-petition has been properly completed. The entire part-petition is invalid if the circulator's statement is not completed as required by law.

**{¶ 48}** In his directive, the secretary uses the passive voice regarding the completion of the circulator statement. He says that it must be completed, not that the circulator himself must complete it. There is certainly no definitive statement that the blanks in the circulator statement—outside of the signature line—must be physically filled in by the circulator.

**{¶ 49}** The lead opinion elevates the secretary's ambiguously worded sentence fragment on a sample form that *possibly* reflects the secretary's desire that a circulator fill out his own statement to a statutory requirement that must be strictly complied with. But the supposed requirement is not actually in the statute.

**{¶ 50}** "In construing a statute, we may not add or delete words." *State v. Hughes*, 86 Ohio St.3d 424, 427, 715 N.E.2d 540 (1999). In this case, the majority not only adds words requiring that a circulator himself write in his own hand the number of signatures that appear on a petition, but by doing so it also needlessly interferes in the election process. Today's decision should also be a cautionary tale to candidates and issue supporters who think that the careful and responsible tack is to check over and amend part-petition before filing them. After today's decision, changes to the indication of the number of signers on a part-petition—even to correct counting errors—cannot be recorded on the part-petition by anyone but the

18

circulator, in his or her own hand. This is a needless, nonstatutory requirement judicially grafted upon an already daunting petition process.

FRENCH, J., concurs in the foregoing opinion.

_____

McTigue and Colombo, L.L.C., Donald J. McTigue, J. Corey Colombo, Derek S. Clinger, and Ben F.C. Wallace, for relators.

Carol Hamilton O'Brien, Delaware County Prosecuting Attorney, and Christopher D. Betts and Andrew J. King, Assistant Prosecuting Attorneys, for respondent.

_____