Kennedy, J., concurring in part and dissenting in part.
*1073 {¶ 15} I agree with the majority's statement that in the future, block billing, that is, billing for a block of time in which several separate tasks were performed, will no longer be permitted in applications for attorney fees in this court and that tasks should be billed individually and in tenths of an hour. I also agree that in the application submitted by relators, Mark A. Harris, Richard N. Haig, Jacqueline L. Kogan, Cheryl L. Davis, and Travis Lane Maggard (the "committee"), to recover attorney fees in connection with the committee's successful petition for a writ of mandamus, the attorneys' bills undercounted the hours that are attributable to the committee's reply brief in the mandamus action and that the charges for preparing that brief are subject to a 28.57 percent reduction. I do not agree, however, that the plain language of R.C. 733.61 permits the committee to be reimbursed for the attorney fees incurred before the Solon law director rejected the committee's written demand that the law director seek a writ of mandamus to compel the city to submit the committee's initiative petition to the board of elections. Reimbursable attorney fees should be calculated beginning with the committee's response to that rejection. Further, as to the attorney fees incurred after the law director refused to bring a mandamus action, I do not agree with the majority's "substantial reductions" applied across the board to the remainder of the fees that were requested and its refusal to award the committee its requested costs.
*301 {¶ 16} In our decision issuing the writ sought by the committee (the "writ action"), we awarded attorney fees but required the committee to file "an itemized application and independent evidence supporting the reasonableness of the hourly rates charged and the hours billed." 155 Ohio St.3d 123, 2018-Ohio-3609, 119 N.E.3d 1238, ¶ 36. The committee has done what we asked, submitting as independent evidence an affidavit from an expert that supports the reasonableness of the attorneys' billing. Respondents, city of Solon, Solon City Council, and Solon Director of Finance Matt Rubino (collectively, the "city"), do not dispute the reasonableness of the hours expended or the committee's hiring of two law firms, each with expertise in the two unrelated fields of law that were brought to bear in this expedited election matter involving zoning. While the majority, under the guise of independent judicial review, finds that the hours expended were unreasonable, it does so without analyzing the actual time expended, and it leaves unaddressed the expert testimony submitted. Its across-the-board deductions lack support in the record.
{¶ 17} We also granted the committee its costs in the writ action, but contrary to the majority's findings regarding this application for fees, the costs sought here are payable under the plain and unambiguous language of R.C. 733.61, and should be paid in full.
I. Attorney Fees
A. R.C. 733.58, 733.59, and 733.61 provide the statutory basis for the award of attorney fees
{¶ 18} Pursuant to R.C. 733.58, "when an officer * * * of a municipal corporation *1074 fails to perform any duty expressly enjoined by law or ordinance, the * * * city director of law shall apply to a court of competent jurisdiction for a writ of mandamus to compel the performance of the duty." If the law director fails to apply for the writ after a taxpayer has made a written request to do so, the taxpayer "may institute suit in his own name, on behalf of the municipal corporation." R.C. 733.59.
{¶ 19} Under the "American Rule," the "prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc. , 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). But R.C. 733.61 contains an exception to the general rule.
{¶ 20} The General Assembly in R.C. 733.61 states that if a court hearing a taxpayer action under R.C. 733.59 is "satisfied that the taxpayer has good cause to believe that his allegations were well founded, or if they are sufficient in law, it shall make such order as the equity of the case demands. * * * [T]he taxpayer shall be allowed his costs, and, if judgment is finally ordered in his favor, he may be allowed, as part of the costs, a reasonable compensation for his attorney."
*302 {¶ 21} Our duty in construing a statute is to give effect to the intent of the General Assembly. Griffith v. Aultman Hosp. , 146 Ohio St.3d 196, 2016-Ohio-1138, 54 N.E.3d 1196, ¶ 18 ; Fisher v. Hasenjager , 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 20. "When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need for this court to apply the rules of statutory interpretation." Symmes Twp. Bd. of Trustees v. Smyth , 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000). Rather, "[a]n unambiguous statute is to be applied, not interpreted." Sears v. Weimer , 143 Ohio St. 312, 55 N.E.2d 413 (1944), paragraph five of the syllabus.
{¶ 22} The plain and unambiguous language of R.C. 733.61 establishes two criteria to recover attorney fees as part of the costs of an action filed under R.C. 733.59. The first provision is a gatekeeping mechanism that requires a court to find either that the taxpayer had "good cause to believe" his complaint was "well founded" or that the complaint was "sufficient in law." If either finding is made, the court must issue an order as equity demands and the taxpayer is to be awarded his costs. Second, if a judgment is issued in the taxpayer's favor, the court may allow, "as part of the costs, a reasonable compensation for his attorney." The determination of what is "reasonable," then, establishes the amount, if any, a taxpayer is entitled to recover.
{¶ 23} The majority finds, and I agree, that the committee " 'had good cause to believe that [its] allegations were well founded, [and that] they are sufficient in law.' " Majority opinion at ¶ 2, quoting R.C. 733.61. Therefore, the threshold criterion is met, and because this court issued the writ of mandamus requested by the committee, this court had the discretion to award attorney fees. Having determined in the writ decision that the committee is entitled to reasonable attorney fees, we now must determine whether the fees requested by the committee are reasonable.
{¶ 24} First, we must decide whether the committee is entitled to an award of fees for the work performed by its attorneys before the city's law director refused to seek the writ of mandamus. Construing the applicable statutes together yields the conclusion that the only fees that are reimbursable are those for the attorneys' work after the law director refused to bring an action. Under R.C 733.61, the court "hearing a case under section 733.59" may award attorney fees. So we begin from the *1075 point that the case for which attorney fees may be awarded is an R.C. 733.59 case. Under R.C. 733.59, a taxpayer's right to sue does not arise until after a law director fails to file suit. Therefore an R.C. 733.59 case, by definition, is one that arises from the refusal of a taxpayer's request. It has no life before that refusal. It follows that compensable costs from "a case under section 733.59" are only those that arose after the law director's failure to act. *303 {¶ 25} This makes sense considering the statutory scheme. A taxpayer who is successful through the preparation of a written request in urging the city law director to bring a mandamus action does not receive compensation for the effort undertaken to convince the law director to bring the action. Had the law director here responded positively to the committee's demand letter, the committee would not have been entitled to any fees for its efforts. The availability of attorney fees arises only when the taxpayer has brought a worthy action by the taxpayer's own effort.
{¶ 26} The committee's attorneys were notified by the law director that he had rejected the committee's demand on July 31, 2018. At that point, the committee's right to bring a taxpayer suit arose under R.C. 733.59. I would hold that the calculation of an award of attorney fees begins on that date. Therefore, I would deduct $8,330 from the bill from Berns, Ockner & Greenberger, L.L.C. (the "Berns firm"), and $13,280 from the bill from McTigue & Colombo, L.L.C. (the "McTigue firm").
B. The majority abandons the Prof.Cond.R. 1.5(a) factors for determining reasonableness
{¶ 27} The majority cites Bittner v. Tri-County Toyota, Inc. , 58 Ohio St.3d 143, 145, 569 N.E.2d 464 (1991), as authority for determining reasonable attorney fees. While I agree that Bittner gives us a road map for determining whether the time claimed in a fee application is reasonable, I disagree with the majority's unexplained decision to abandon the road map and chart its own course.
{¶ 28} In Bittner , we held, "When awarding reasonable attorney fees * * *, the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by the application of the factors listed in [former] DR 2-106(B) [now Prof.Cond.R. 1.5(a) ]." Id. at paragraph one of the syllabus.
{¶ 29} In the first step, the "prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." Hensley v. Eckerhart , 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The number of hours reasonably expended are then multiplied by the reasonable hourly rate. The resulting number is often called the "lodestar figure." See, e.g. , Sims v. Nissan N. Am., Inc. , 2015-Ohio-5367, 55 N.E.3d 488, ¶ 22 (10th Dist.).
{¶ 30} In the second step, Prof.Cond.R. 1.5(a) sets forth factors to consider when determining whether a fee is reasonable:
*304 (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
*1076 (5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
(8) whether the fee is fixed or contingent.
{¶ 31} Although consideration of these factors is described as the second part of the attorney-fee-calculation process in Bittner -after the number of hours reasonably expended on the litigation are multiplied by a reasonable hourly rate-the two steps "may overlap * * * because several of the reasonableness factors are often subsumed within the initial lodestar calculation." Miller v. Grimsley , 197 Ohio App.3d 167, 2011-Ohio-6049, 966 N.E.2d 932, ¶ 14 (10th Dist.).
{¶ 32} Since step one considers the "reasonableness" of the hours charged, it follows that the Prof.Cond.R. 1.5(a) factors should be considered when determining what is reasonable. This is especially true when dealing with a case in which attorney fees are awarded pursuant to R.C. 733.61, which allows as part of costs "a reasonable compensation for [the taxpayer's] attorney." (Emphasis added.) Pursuant to R.C. 1.42, "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." We should construe the word "reasonableness" for the purpose of awarding fees under R.C. 733.61 by applying the "particular meaning" of reasonableness developed by this court in Prof.Cond.R. 1.5(a).
{¶ 33} The majority opinion does not analyze the time expended in light of the specific facts of this case or examine the reasonableness factors set forth in Prof.Cond.R. 1.5(a). In this way, the majority opinion lacks both context and structure. By unmooring the reasonableness determination from the factors in Prof.Cond.R. 1.5(a) and failing to juxtapose the time the attorneys claimed in the fee application with the progress of the election litigation in real time, the majority summarily determines that a portion of the time expended is unreasonable. I do not agree with this approach.
*305 C. The majority's reasons for its substantial reductions are unavailing
{¶ 34} The majority's basic conclusion-sitting in judgment months after the maelstrom of litigation was complete-is that the committee's legal team in this expedited election case was overstaffed. It then applies drastic, across-the-board cuts to the fees requested apparently based on a gut reaction to the itemized statements in the fee application, after it reviewed the statements outside of the facts of the case and without considering the factors in Prof.Cond.R. 1.5(a) or the affidavit of the committee's expert.
{¶ 35} The majority gives lip service to the fact that this case involved an expedited election matter with extraordinarily tight time frames. It acknowledges that a "divide-and-conquer approach is understandable in an expedited case," majority opinion at ¶ 9, but decries the committee's attorneys when they worked together. For the majority, dividing work is the only acceptable way of attacking a case with an expedited timeline; a team approach is unreasonable. But to the contrary, it makes perfect sense that in a novel area of the law, in a tight timeframe, more than one attorney might develop arguments and review and draft the same documents. The committee had one shot to get its initiative *1077 on the November 2018 ballot-that the law firms may have put multiple eyes on the same documents is not necessarily excessive. A collaborative approach is not inherently unreasonable, especially considering the truncated timeframe of the writ action.
{¶ 36} One object of the majority's criticism is the number of interoffice communications between the Berns firm and the McTigue firm, the committee's two law firms, and of intraoffice communications among lawyers at each firm that were double- or triple-billed. In support of this criticism, the majority relies on Howe v. Akron , N.D.Ohio No. 5:06-cv-2779, 2016 WL 916701 (Mar. 10, 2016), aff'd , 705 Fed.Appx. 376 (6th Cir.2017). However, the majority's reliance on Howe is misplaced.
{¶ 37} In Howe , Akron firefighters alleged race discrimination, age discrimination, and equal-protection violations under federal law. After it rendered judgment for the firefighters on some claims, the court addressed the firefighters' request for attorney fees. It found that the billing statements contained "evidence of redundancy" and questioned the need for the involvement of two law firms given that the local law firm that had been hired first was considered to have expertise in the area of law. This is not the case here.
{¶ 38} The Berns law firm was handling the development project that required the zoning initiative and became ensnared in an unusual circumstance when the city failed to place the initiative on the November 2018 ballot. The city instead argued that the initiative should be read by title at three separate city-council meetings. Being placed between a rock and a hard place by the city, the Berns *306 firm then contacted the McTigue firm, which was quickly hired to handle the fast-paced, time-sensitive election action.
{¶ 39} The fact that these two law firms, with vastly different areas of legal expertise, engaged in significant interoffice and intraoffice communications while embroiled in the expedited election case is to be expected. "Multiple-lawyer litigation is common and not inherently unreasonable." Northeast Ohio Coalition for the Homeless v. Husted , 831 F.3d 686, 704 (6th Cir.2016). "There is no hard-and-fast rule as to how many lawyers can be at a meeting or how many hours lawyers can spend discussing a project." Gautreaux v. Chicago Hous. Auth. , 491 F.3d 649, 661 (7th Cir.2007).
{¶ 40} The committee's application for attorney fees contained detailed billing statements from both firms, even though in some cases each firm collected several tasks in block entries. If the majority believes the legal team was overstaffed, why doesn't it specifically identify the offending time entries and reduce the fees by the amount of the fee in that entry or if the fees were part of block-billed entries, reduce the fees by the entire block-billed entry? Moreover, what is the source of the majority's across-the-board reduction-percentage formula? It reads like a punishment.
{¶ 41} The majority cites Howe ("See Howe at *17 [collecting cases]," majority opinion at ¶ 10) in support of its across-the-board reductions. Again, Howe is a bad example. In that case, the defendant mounted a robust attack against the reasonableness of the attorney-fee application, disputing thousands of hours of charges. The court extensively reviewed the bills and found that "[t]he task of trimming the fat to exclude excessive or redundant hours is hindered by the fact that the billing records suffer from a troubling lack of detail." Id. at *12. The court ultimately concluded, "Given the voluminous nature of the fee documentation, coupled with the serious and repeated documentation deficiencies, the Court finds that 'an-hour-by-hour review is simply impractical and a *1078 waste of judicial resources.' Loranger v. Stierheim , 10 F.3d 776, 783 (11th Cir. 1994)." Id. at *17. It then applied an across-the-board reduction as some other courts have done.
{¶ 42} Howe cited other cases that reduced fees across the board, including one in which the fee application contained " 'commingled and undifferentiated estimates of time' " spent on cases in multiple jurisdictions that resulted in differing levels of success. Schwarz v. Secy. of Health & Human Servs. , 73 F.3d 895, 906 (9th Cir.1995), quoting Schwarz v. Secy. of Health & Human Servs., D.Or. No. 92-907-JO, 1994 U.S. Dist. LEXIS 21722, *7 (July 25, 1994). Another case involved deficient entries included amongst 1,129 pages of time records. Cobell v. Norton , 407 F.Supp.2d 140, 166 (D.D.C.2005). Another featured "vague and incomplete records" and inadequate billing information in one-line summaries.
*307 Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc. , 707 F.Supp.2d 737, 764 (N.D.Ohio 2010).
{¶ 43} But here, the fee application is neither voluminous nor deficient. The billing statements totaled 24 pages-including charges incurred prior to July 31, 2018-and are well detailed. This litigation was not a multiyear slog but a one- or two-month sprint.
{¶ 44} The billing statements are detailed, organized, and manageable in length. But the majority takes an ax to the entire bill anyway. What makes a 30 percent reduction factor appropriate for most of the attorneys of one firm and a 50 percent reduction factor appropriate for the other firm?
{¶ 45} One court has explained that part of the challenge of awarding attorney fees is that certain hours claimed cannot be verified and reviewed by the court: "Hours spent in reviewing records, talking to other lawyers or experts, preparing legal documents and the like cannot be fully verified and require the court to trust the lawyer's word that the hours claimed represent necessary work actually performed." Coulter v. Tennessee , 805 F.2d 146, 150 (6th Cir.1986). Rather than trust the lawyer's word, in this case, the majority trusts its gut. That is no better a solution to determining a reasonable fee.
D. The context behind the charges
{¶ 46} The amount of attorney fees must be determined on the facts of each case. Hensley , 461 U.S. 424 at 429, 103 S.Ct. 1933, 76 L.Ed.2d 40. This court should consider the context of the case and evaluate the reasonableness of the charges by applying the factors in Prof.Cond.R. 1.5(a).
{¶ 47} The ultimate goal of the attorneys in this case was to compel the city to place an initiative petition proposing a zoning change on the November 2018 ballot. The zoning change was a step toward developing a proposed mixed-use project. 155 Ohio St.3d 123, 2018-Ohio-3609, 119 N.E.3d 1238, at ¶ 3. "If created, the mixed-use district would permit development of the property to include single-and multi-family dwellings, a winery, a spa, a boutique hotel, certain retail uses, a senior-living facility, and an underground parking garage." Id.
{¶ 48} This taxpayer mandamus action was the committee's last opportunity to place the initiative on the November 2018 ballot. The arguments the committee presented to the court were complex and varied. One major argument focused on whether state law or the city charter controlled the process for placing an initiative on the ballot. The second major focus was whether, if the city charter controlled, the city council must certify the initiative to the board of elections without it having been read at three council meetings; this argument also addressed whether the city *1079 council's past practice in similar situations was entitled to deference. *308 {¶ 49} The billing statements, which are comprehensive and detailed, are a narrative of the development of the case and demonstrate the reasonableness of the fees sought by the attorneys for work performed after they had received the letter from the law director refusing to seek a writ of mandamus. Here is the context for the services performed by the attorneys in this case once they received the director of law's refusal letter.
{¶ 50} On July 31, 2018, Jordan Berns ("Berns") and Majeed Makhlouf of the Berns firm reviewed the response from the law director denying the taxpayer demand and forwarded the letter to Derek Clinger of the McTigue firm. This lit the flame. Soon, both firms would be engulfed in a specialized litigation process that would burn bright for a few weeks.
{¶ 51} On August 1, Donald McTigue of the McTigue firm reviewed the law director's letter and e-mailed Berns to schedule a conference call. On the conference call, McTigue, Clinger, Makhlouf, and Berns discussed strategy. Clinger began drafting a reply to the law director, and McTigue inquired in the call whether consent of all the committee members was needed for his firm's representation. Makhlouf revised the reply letter and both he and Berns prepared for a course of action.
{¶ 52} On August 2, McTigue reviewed multiple e-mails from committee members while Clinger revised the final draft of the reply letter to the law director. On that same date Berns discovered that the city council posted notice on July 31, 2018 (the same day the board of elections certified that the petition contained sufficient signatures) that it was holding a special council meeting on August 2. He drafted an e-mail to the law director to ask if the proposed rezoning ordinance was on the agenda for a first reading and sent it to McTigue for review. After reviewing and approving the e-mail to the law director, McTigue reviewed and approved an e-mail to the committee members.
{¶ 53} On August 3, Makhlouf and Berns discussed the city council's failure at the previous day's special meeting to forward the initiative petition to be placed on the ballot and analyzed constitutional issues. McTigue conferred with Clinger about the mandamus complaint and edited a first draft of a complaint.
{¶ 54} On August 4, McTigue edited another draft of the complaint and e-mailed it to co-counsel.
{¶ 55} On August 5, Makhlouf revised the complaint.
{¶ 56} On August 6, Berns discussed the complaint with Makhlouf, and they revised it further. Berns also spoke with the law director regarding whether the city council would pass an ordinance on an emergency basis to waive the three-reading rule. Berns and Makhlouf prepared for that day's council meeting and drafted a statement to be read during the public-comment period of the meeting *309 relating to the dispute-outlining the city's obligation to put the proposed initiative zoning ordinance on the ballot for the November 6, 2018 election-and attended the meeting. Benjamin Ockner of the Berns firm also reviewed the complaint and recommended changes.
{¶ 57} On August 7, McTigue and Clinger reviewed an e-mail from Berns regarding the city-council meeting. Clinger also had a conference call with Berns and Makhlouf about finalizing the complaint and then discussed the call with McTigue.
{¶ 58} On August 8, 2018, in preparation of the filing of the complaint, the Berns firm had multiple lawyers engaged in reviewing *1080 and revising the complaint and working on separate aspects of its filing. On that date, Berns was engaged in revising the complaint-discussing aspects of the complaint with other attorneys on the team-and was responsible for filing the complaint with this court. Makhlouf worked with Berns revising the complaint, but also worked on revising the affidavit in support of the complaint separately, and sent multiple e-mails to co-counsel and clients. Robert McDowall of the Berns firm-at the request of Makhlouf-reviewed a portion of the argument and worked with Ockner to e-file the mandamus complaint with this court and sent follow-up e-mails. Sheldon Berns from the Berns firm worked with Berns and Makhlouf on revising the mandamus complaint. Ockner reviewed the mandamus complaint and changes suggested by the McTigue firm. He also assisted in preparing the affidavit, conferred with Sheldon Berns and finalized the complaint for filing, reviewed and finalized the motion to establish security, and corresponded with the clients, the city, and the board of elections.
{¶ 59} On that same date, McTigue reviewed the complaint and its revisions, conferred with Clinger, and reviewed the draft motion to set bond. After speaking with Clinger, he approved a final draft of the complaint.
{¶ 60} On August 9, the committee filed its mandamus action in this court. The filing of the complaint triggered an intensive period of litigation spurred by this court's rules regarding expedited election matters. See S.Ct.Prac.R. 12.08. The city had five days after the service of the complaint to file an answer. Three days after that, the committee had to file a merit brief and evidence in support of its complaint. The city's brief in response was due in another three days. Three days after that, the committee's reply to the city's brief was due.
{¶ 61} Also on August 9, Berns discussed with Makhlouf and Ockner the evidence that was needed to support the merit brief and discussed a public-records request to acquire evidence from the city. Berns drafted the public-records request, and after it was reviewed by Clinger and McTigue, he finalized it and submitted it to the city.
*310 {¶ 62} On August 10, Clinger began drafting the merit brief, and Berns corresponded with Rubino, the city's finance director, about the public-records request and the production of documents.
{¶ 63} On August 13, Berns and Makhlouf corresponded with Rubino about the public-records request and left a message for Cuyahoga County Assistant Prosecutor Brendan Doyle regarding why they had named the board of elections as a party in the complaint. Berns then spoke with Doyle about voluntarily dismissing the board of elections from the action. Berns then spoke with Clinger about the request to voluntarily dismiss the board, and Clinger discussed the matter with McTigue. Clinger also reviewed Berns's e-mail about the public-records request and checked whether the complaint and a summons had been served.
{¶ 64} On August 15, Berns began drafting the statement of facts for the merit brief. He reviewed the video of a councilman's comments from the July 2 council meeting and identified the portions of the video that needed to be transcribed and offered as evidence in support of the merit brief. Berns also corresponded with Rubino regarding the response to the public-records request and gathered and reviewed other evidence, including the rezoning application and city-council and planning-commission minutes. Makhlouf prepared evidence and reviewed the statement *1081 of facts drafted by Berns. Berns and Makhlouf consulted with Clinger and McTigue regarding the merit brief and the evidence. McTigue also reviewed e-mails from Rubino and reviewed the notice of the service of summons.
{¶ 65} On August 16, Berns and Makhlouf continued working on the statement of facts and evidence. Berns also spoke with the law director about the briefing schedule and the response to the public-records request. McTigue e-mailed Berns about filing the merit brief on August 20, since the city would file its answer on August 17. They also discussed the draft of the statement of facts and exhibits. Clinger continued drafting the merit brief.
{¶ 66} On August 17, the city filed its answer to the mandamus complaint. McTigue conferred with co-counsel, reviewed a draft of the statement of facts, reviewed the city's answer, discussed the city's admissions in the answer, and conferred with Clinger about an outline of the argument for the brief. While Clinger drafted the argument portion of the merit brief, Berns had a discussion with the clerk of the city council about the documents to be produced in response to the public-records request. Meanwhile, Makhlouf worked on the evidence and conferred with others about the city's handling of past initiative petitions and sought legislative history about a past ordinance. He also conferred with co-counsel about the admissions in the city's answer.
{¶ 67} On August 18, McTigue, Berns, and Makhlouf reviewed the first draft of the brief. McTigue spoke with Clinger about the draft, and Clinger began editing the brief. Berns and Makhlouf also edited the draft and reviewed related *311 documents, including a timeline, that the committee gave the attorneys containing additional information to be included in the statement of facts. After an e-mail exchange, McTigue reviewed the committee's documents, and Clinger scheduled a conference call regarding the brief.
{¶ 68} On August 19, Clinger, McTigue, Makhlouf, and Berns had a conference call. Clinger created a working document of the four attorneys' comments and e-mailed it to Berns and Makhlouf. Makhlouf and Berns prepared affidavits and gathered and organized exhibits for the brief. McTigue reviewed an e-mail about the committee's documents and the timeline.
{¶ 69} On August 20, McDowall researched the standard of review. Sheldon Berns read the merit brief and conferred with Berns and Makhlouf. Makhlouf and Berns finalized the brief, the affidavits, the appendix of authorities, and the certificate of service for the brief. McTigue reviewed and edited the draft, conferred with Clinger, exchanged e-mails with co-counsel about the appendix and serving the board of elections and then confirmed that the brief had been filed. Clinger also helped finalize the brief and the final evidence package.
{¶ 70} On August 21, Clinger had a brief conversation with Berns about service of the merit brief and then began preparing the reply brief, researching mandamus and declaratory-judgment actions and constitutional challenges. McTigue briefly reviewed the filed brief and the answer filed by the board of elections, and he had an e-mail exchange regarding the reply brief. McDowall conferred with Berns and Makhlouf and researched deference to past practices and other matters. Berns and Makhlouf discussed the city's possible arguments and the committee's responses.
{¶ 71} On August 22, McDowall completed research regarding deference and drafted a memorandum summarizing federal and state law on the subject. He began researching another issue, the absurdity *1082 doctrine. Berns and Makhlouf had a conference call with Clinger and McTigue, and Berns read the legal research Clinger had completed on mandamus and declaratory-judgment actions.
{¶ 72} On August 23, the city filed its merit brief. McDowall finished researching the absurdity doctrine and drafted a memorandum to Makhlouf. Sheldon Berns read the city's brief and consulted with Berns and Makhlouf. Berns and Makhlouf, after reviewing the city's brief, e-mailed the portions of the committee's reply brief that they had drafted in advance to McTigue and worked on sections of the reply. Clinger and Ben Wallace (of the McTigue firm) conferred with McTigue. Clinger then reviewed the city's brief. McTigue conferred with Clinger and Wallace regarding their assignments.
{¶ 73} On August 24, Wallace reviewed the briefs. Clinger drafted his portion of the reply brief and sent it to McTigue. McTigue reviewed the city's evidence and e-mailed the team regarding the draft reply brief. Berns and Makhlouf *312 worked on the draft of the reply brief in regard to the plain language of the city's charter.
{¶ 74} On August 25, Berns and Makhlouf revised the introduction of the reply brief and discussed that work with McTigue. They began incorporating the work of McTigue's team into the reply brief and e-mailed the draft to McTigue. McTigue reviewed this draft and consulted with co-counsel.
{¶ 75} On August 26, Sheldon Berns and Makhlouf reviewed the reply brief McTigue had edited and consulted with the McTigue team. McTigue told Wallace to conduct additional research.
{¶ 76} On August 27, the attorneys revised the reply brief. At the direction of McTigue, Wallace drafted the table of contents and the table of authorities. McTigue approved the final draft, and Makhlouf filed the brief.
{¶ 77} On August 28, Makhlouf and McTigue reviewed a statement of interest that was filed by the board of elections.
{¶ 78} On September 7, this court issued the final decision in the writ action in favor of the committee. Clinger, McTigue, Makhlouf, and Berns reviewed this court's decision, and McTigue conferred with co-counsel and sent an e-mail to the committee.
{¶ 79} A little over five weeks had passed since the city's law director refused to seek a writ of mandamus.
E. Application of Prof.Cond.R. 1.5(a)
{¶ 80} The majority finds that this case was overstaffed. I disagree. The vast majority of the hours billed in the case were incurred by two lawyers at each firm: McTigue and Clinger at the McTigue firm and Berns and Makhlouf at the Berns firm. Other lawyers performed spot duty.
{¶ 81} Prof.Cond.R. 1.5(a) sets forth factors to be considered in determining the reasonableness of a fee. This court promulgated those factors, and we should apply them when called upon to determine the reasonableness of attorney fees. The committee's expert relies upon these factors, but the majority ignores them.
{¶ 82} In regard to the factors listed in Prof.Cond.R. 1.5(a)(1)-"the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly"-this matter hits all the marks. This case involves the relatively specialized area of election law as well as the esoteric topics of municipal charter interpretation, home rule, and taxpayer-initiated complaints in mandamus. The lawyers faced extraordinary time pressures because the election was looming and because this court's rules establish a truncated briefing *1083 schedule in expedited election matters. The case called for expertise and teamwork. *313 {¶ 83} Also, given the compressed time schedule and the urgency and pace at which expedited election matters progress, it was unlikely that the attorneys involved could accept other cases that would require their immediate attention. See Prof.Cond.R. 1.5(a)(2) and (a)(5).
{¶ 84} The expert testified that he had reviewed the engagement letters between the committee and its attorneys and that the rates charged were "equal to or less than hourly rates which may be charged for similar services by other attorneys in Ohio with similar expertise." See Prof.Cond.R. 1.5(a)(3).
{¶ 85} Indisputably, the significance of the result the firms obtained for their client-the granting of a writ of mandamus forcing Rubino to certify the initiative petition to the board of elections to be placed on the November 2018 ballot in accord with Ohio law-cannot be overstated. See Prof.Cond.R. 1.5(a)(4).
{¶ 86} Finally, the expert's affidavit asserted that the attorneys involved were "experts in their professional area." See Prof.Cond.R. 1.5(a)(7).
{¶ 87} When the time detailed in the fee application is overlaid with the facts of the expedited election matter in conjunction with the reasonableness factors set forth in Prof.Cond.R. 1.5(a), the fees billed by both the Berns firm and the McTigue firm are reasonable.
II. Costs
{¶ 88} The majority refuses to award all the costs submitted by the committee, finding that a transcript was not necessary and that other expenses are not generally allowable. The starting point of determining what costs are permissible must begin with the language of the statute authorizing the court to award costs.
{¶ 89} R.C. 733.61 provides that if a court has good cause to believe that the taxpayer allegations were "well founded" or "sufficient in law," the court shall issue an order as equity demands and "the taxpayer shall be allowed his costs." The awarding of costs-except for attorney fees-is not dependent on the success of the action.
{¶ 90} Despite the language of the statute, the majority refuses in part the committee's request for court costs (other than the filing fee, which has been reimbursed by this court), relying partially on State v. Sewell , 4th Dist. Ross No. 11CA3207, 2011-Ohio-5532, 2011 WL 5135252, ¶ 15. However, the majority's reliance on Sewell is misplaced.
{¶ 91} Sewell, who had been convicted of two counts of rape, challenged the attorney general's reclassification under a newly enacted sexual-offender-classification scheme. After the reclassification was reversed by this court and he was reinstated to his original classification, Sewell sought reimbursement for various expenses of the action. The trial court refused to award the expenses as costs, and the appellate court affirmed.
*314 {¶ 92} The appellate court noted that Sewell sought litigation expenses pursuant to Civ.R. 54(D), R.C. 2323.51, and Civ.R. 11 in his motion for fees. But because Sewell did not argue on appeal that he was entitled to relief under either R.C. 2323.51 or Civ.R. 11, which allow the recovery of attorney fees for frivolous conduct, the appellate court rejected those claims.
{¶ 93} Turning its attention to Sewell's remaining claim pursuant to Civ.R. 54(D), the appellate court held that " '[t]o be taxable as a cost under Civ.R. 54(D), an expense must be grounded in statute.' "
*1084 Id. at ¶ 12, citing Keaton v. Pike Community Hosp. , 124 Ohio App.3d 153, 156, 705 N.E.2d 734 (4th Dist.1997). Because Sewell failed to demonstrate any statutory basis on which he was entitled to recover photocopying and postage costs, the court denied those costs. Sewell at ¶ 15, citing Cincinnati ex rel. Simons v. Cincinnati , 86 Ohio App.3d 258, 267, 620 N.E.2d 940 (1st Dist.1993).
{¶ 94} But Sewell sought costs under Civ.R. 54(D). R.C. 733.61, under which the committee pursues its costs here, provides an independent basis for the award of costs. Therefore, costs awarded under that statute are not subject to the restrictions of Civ.R. 54(D), which provides, "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs." R.C. 733.61 puts the award of costs differently, instructing the court to make an order "as the equity of the case demands," as long as "the taxpayer had good cause to believe that his allegations were well founded, or if they are sufficient in law."
{¶ 95} Therefore, this court is to award costs as equity demands, not as caselaw interpreting Civ.R. 54(D) demands. R.C. 733.61 recognizes that a taxpayer is taking on an action that the municipality should have undertaken itself. Equity demands that all the costs reasonably expended to that end are to be reimbursed. R.C. 733.61 is akin to R.C. 4123.512(F), which awards costs to a successful claimant in a workers' compensation appeal. R.C. 4123.512(F) is "intended to protect a claimant who is forced to litigate an appeal." Holmes v. Crawford Machine, Inc. , 134 Ohio St.3d 303, 2012-Ohio-5380, 982 N.E.2d 643, ¶ 7. Like R.C. 733.61, R.C. 4123.512(F) is different from Civ.R. 54(D) and awards a broader array of costs. Costs such as "photocopies, postage, meals and parking" have been determined to be reimbursable under that statute. Bland v. Ryan , 2012-Ohio-3176, 977 N.E.2d 107, ¶ 1-2 (2d Dist.).
{¶ 96} Moreover, the majority's reliance on R.C. 2303.21 in denying the committees' transcript cost is disingenuous. Even under R.C. 2303.21, the majority should include in the costs awarded to the committee the amount expended for the city-council-meeting transcripts. R.C. 2303.21 provides that "[w]hen it is necessary in [a] civil action to procure a transcript of a judgment or proceeding, * * * as evidence in such action or for any other purpose , the expense of *315 procuring such transcript or exemplification shall be taxed in the bill of costs." (Emphasis added.) Even though one transcript was not filed here, the availability of both transcripts to all the lawyers working on the case for quick reference-rather than listening to the proceedings-was a worthy purpose that may even have resulted in less billable attorney time for reviewing the proceedings.
{¶ 97} I would award all the costs that the committee seeks-if they were incurred on or after July 31-including postage and conference-call expenses and court-reporter fees for having both city-council meetings transcribed. The majority correctly holds that since the committee's filing fees at this court will be refunded pursuant to this court's rules, see S.Ct.Prac.R. 18.05(A)(2)(c), we need not award those fees as costs.
{¶ 98} Because R.C. 733.61 controls the recovery of costs in the committee's taxpayer action, the committee is entitled to recover all costs other than $134.68, the filing fees reimbursed to the committee and now charged by this court to the city, and $87.41, the amount incurred prior to July 31. The committee submitted costs totaling $1,256.65; I would award the committee $1,034.56.
*1085 III. Reduction for additional time attributable to the reply brief
{¶ 99} I agree with the majority that the attorney-fee application understates the charges that are attributable to preparing the committee's reply brief in the mandamus action. Charges related to that brief are subject to be reduced by 28.57 percent because several pages of the brief were struck in the writ action when the brief exceeded the page limits allowed by our rule. The Berns firm attributed $13,335 of its total bill to the reply brief and therefore subtracted $3,815 from its bill after applying the discount. However, the entries on the billing statement that mention the reply brief and other entries that do not mention the brief but are related to it actually total $20,660. Some of the tasks related to the reply brief appear in block-billing entries, and it is impossible to determine exactly how much time should be attributed to each task. Therefore, the entire block-billed entry must be considered to be related to the reply. Once the 28.57 percent reduction is applied to the $20,660 total fee, the Berns firm bill should be reduced by $5,902.56, not $3,815 as the attorneys claim.
{¶ 100} The McTigue firm, on the other hand, underreported three hours that one attorney spent working on the reply. That attorney's rate was $200 per hour. After applying the 28.57 percent discount, the McTigue firm should have reduced its fee an additional $171.42 from its total bill.
IV. Conclusion
{¶ 101} " '[T]he most critical factor' governing the reasonableness of a fee award 'is the degree of success obtained.' " Waldo v. Consumers Energy Co. , 726 F.3d 802, 822 (6th Cir.2013), quoting *316 Hensley , 461 U.S. at 436, 103 S.Ct. 1933, 76 L.Ed.2d 40. If a taxpayer is forced to bring a mandamus action because a village or municipality refuses to perform an act that it is required to do under Ohio law, and the taxpayer is unable to recover attorney fees for the legal services needed to bring that action, the underlying intention of the General Assembly-to afford that taxpayer relief-would be thwarted.
{¶ 102} The committee filed an "itemized application and independent evidence supporting the reasonableness of the hourly rates charged and the hours billed" as this court instructed it to do, 155 Ohio St.3d 123, 2018-Ohio-3609, 119 N.E.3d 1238, at ¶ 36. The committee submitted an affidavit from an expert that supports the reasonableness of its attorneys' billing. It has also submitted evidence of its costs. The city does not dispute the reasonableness of either.
{¶ 103} After reduction for billing for work performed prior to July 31 and for work on the pages of the committee's reply brief that were struck, I would award the committee $61,124.94 in attorney fees for the work performed by the Berns firm and $21,178.58 in attorney fees for the work performed by the McTigue firm. Finally, I would award $1,034.56 in costs.
{¶ 104} Because the majority awards attorney fees incurred before the city's law director refused the committee's demand to file suit, imposes drastic, across-the-board reductions that lack support in the record, and does not award the committee all of its costs, I dissent from those portions of the majority's decision.
O'Donnell, J., dissenting.
{¶ 105} Respectfully, I dissent.
{¶ 106} I would award attorney fees requested in the application submitted in this case. The basis for awarding these fees is twofold: first, the application is fully supported by a recognized expert, attorney Thomas J. Scanlon, an accomplished business attorney with a well-known reputation *1086 for expertise in real estate law, who has attested to the reasonableness of the hourly rates and to the work that was performed; second, the city of Solon, in its brief in response, has not objected to the expert's affidavit nor has it contested any of the hours or the reasonableness of the fees in this case.
{¶ 107} In addition, today this court has announced its objection to block billing and has retroactively applied a new rule on block billing to the application in this case. When the court announces a rule like this, in my view, it should not be applied retroactively. Accordingly, I would award fees as requested in the application.