Kennedy, J.
*197 {¶ 1} In this appeal from the Fifth District Court of Appeals, we consider the definition of “medical record” as it is used in R.C. 3701.74. Appellant, Gene‘a Griffith (“Griffith”), advances the following proposition of law: “A hospital should not be permitted to withhold portions of a patient’s medical record by unilaterally selecting and storing those medical records in a department other than its medical records department.”
{¶ 2} For the reasons that follow, we conclude that because the Ohio General Assembly did not limit the definition of “medical record” in R.C. 3701.74(A)(8) to data in the medical-records department, the physical location of the data is not relevant to the determination whether that data qualifies as a medical record. Instead, the focus is whether a healthcare provider made a decision to keep data that was generated in the process of the patient’s healthcare treatment and pertains to the patient’s medical history, diagnosis, prognosis, or medical condition. We hold that for purposes of R.C. 3701.74(A)(8), “maintain” means that the healthcare provider has made a decision to keep or preserve the data.
{¶ 3} We reverse the judgment of the court of appeals and remand the matter to the trial court.
I. Facts and Procedural History
A. Howard’s surgery and death
{¶ 4} On May 2, 2012, Howard Griffith (“Howard”), Griffith’s father, was admitted by appellee, Aultman Hospital, for surgery. After being transferred out of intensive care to a step-down unit, Howard developed intermittent atrial fibrillation and was placed on continuous cardiac monitoring.
{¶ 5} Around 4 a.m. on May 6, 2012, a nurse in the step-down unit assessed Howard and found that he was doing well. About 45 minutes later, an x-ray technician found Howard in his bed with his gown ripped off, the cardiac monitor no longer attached to his body, his central line lying on the floor, and his chest tube disconnected. Howard was unresponsive and did not have a heartbeat. Medical personnel resuscitated him and moved him to the intensive-care unit. However, Howard had suffered severe brain damage and after he made no neurological improvement, his family decided to remove him from life support on May 7, 2012. Howard died approximately nine hours later on May 8, 2012.
B. Requests for Howard’s medical record
{¶ 6} On July 24, 2012, Griffith requested a copy of Howard’s complete medical record. The hospital provided some documents in response to this request. Another written request was made on October 17, 2012. On October 22, 2012, the hospital produced the medical record for the period May 2 through 8, 2012, that existed in the medical-records department. On December 12, 2012, Griffith’s *198 representative made an in-person request and was permitted to review what was represented to her as the complete medical record. On December 14, 2012, another written request was made for the medical record. On December 31, 2012, the hospital again produced the medical record that existed in the medical-records department for the period May 2 through 8, 2012.
{¶ 7} Griffith then filed this action pursuant to R.C. 3701.74 and 2317.48 to compel the production of Howard’s complete medical record. The complaint alleged that the hospital had failed to produce any monitoring strips or nursing records from Howard’s hospital stay.
{¶ 8} After filing the complaint, Griffith served the hospital with requests for admissions and interrogatories. In response, the hospital admitted that prior to filing the action, it had failed to produce Howard’s “entire and complete medical record in response” to each of Griffith’s medical-record requests. In the answer to interrogatories, Jennifer Reagan-Nichols, the director of medical records and transcription at the hospital, verified that after Griffith filed the action, the hospital produced Howard’s entire medical record. Contemporaneously with the answer, the hospital produced hard copies of cardiac-monitoring data from May 6, 2012, “as responsive documents from the visit that are not part of the medical record.” Thereafter, Reagan-Nichols was deposed.
{¶ 9} In the initial deposition on March 11, 2013, Reagan-Nichols testified that the hospital had produced Howard’s cardiac-rhythm strips from 4:00 a.m. to 4:51 a.m. on May 6 in response to the request for documents. While monitoring strips for a patient that are received by her department would be made part of the medical record, she explained that Howard’s printouts were not part of his medical record because the nursing staff had not provided them to the medical-records department. She did not know who directed the nurses not to print Howard’s data. Reagan-Nichols did not know whether the strips met the legal definition of “medical record,” but she did not have any reason to believe they did not meet the definition.
{¶ 10} On March 14, 2013, the hospital filed a motion for summary judgment, arguing that a complete copy of Howard’s medical record had been produced. In support, the hospital provided the sworn interrogatory answers of Reagan-Nichols.
{¶ 11} On March 27, 2013, Reagan-Nichols submitted an errata sheet to correct some of her deposition testimony. In that sheet, she stated that the May 6 rhythm strips did not meet the legal definition of “medical record.” She also stated that the rhythm strips “were printed from electronic monitoring equipment after the discharge of the patient at the direction of hospital Risk Management. The data in this equipment is not part of the medical record.”
*199 {¶ 12} Subsequently, the trial court ordered a second deposition to address the issues presented by the errata sheet. In that deposition, Reagan-Nichols stated that to make sure her answers in her first deposition were correct, she asked questions of the hospital’s director of risk management and a registered nurse with the cardiac unit. Reagan-Nichols testified, based on information she had received from the hospital’s director of risk management, that the May 6" rhythm strips provided to Griffith were printed from Howard’s cardiac monitor by a registered nurse after Howard’s death at the direction of the hospital’s risk-management department. She did not know when risk management ordered the nurse to print Howard’s data or whether the nurse printed all the data on the monitor relevant to Howard.
{¶ 13} Reagan-Nichols stated that the cardiac monitor electronically stored a patient’s data for 24 hours after that patient’s discharge. After 24 hours, however, the information was deleted from the monitor unless a physician ordered that the data be saved. Reagan-Nichols did not know for how long the data would be saved. She believed that all of Howard’s monitoring data was saved. With respect to Howard, Reagan-Nichols did not know whether “discharge” meant his transfer from the step-down unit to the intensive-care unit or after his death.
{¶ 14} After the second deposition, the hospital produced a cardiac-rhythm strip for Howard from May 3, 2012, at 2:51 a.m. without qualification.
C. Lower court proceedings
{¶ 15} The trial court granted summary judgment in favor of the hospital. It concluded that the hospital had produced Howard’s medical record, as defined by R.C. 3701.74(A)(8).
{¶ 16} On appeal, the Fifth District affirmed the trial court’s judgment in a two-to-one decision. The majority agreed with the hospital that the word “maintained” in R.C. 3701.74(A)(8) pertains only to records that “‘a hospital determines needs to be maintained by a health care provider in the process of a patient’s health care’ “ ‘not everything having to do with the patient’ ” and “ ‘not that which a Plaintiff in a * * * medical malpractice case thinks should be maintained.’ ” 2014-Ohio-1218, 2014 WL 1342988, ¶ 22, quoting the argument made by the hospital’s attorney on the motion for summary judgment. Therefore, the court held that “the medical record consists of what was maintained by the medical records department and information that the provider decides not to maintain is not part of the medical record.” Id. Documents kept by any other department, including risk management, “do not meet the definition of a medical record because they were not ‘maintained’ by the medical records department.” Id. at ¶ 30. Because the hospital had certified that it produced Howard’s medical *200 records, as that term was defined by the statute, the court of appeals found that the trial court did not err in granting summary judgment for the hospital. Id. at ¶ 22.
II. Law and Analysis
{¶ 17} This appeal requires us to determine what constitutes a “medical record” as that term is used in R.C. 3701.74(A)(8). We agree with the Fifth District that the term “medical record” in R.C. 3701.74(B) does not include all patient data but includes only that data that a healthcare provider has decided to keep or preserve in the process of treatment. However, the Fifth District erred in holding that the medical record consists only of information maintained by the medical-records department. The statute defines “medical record” to mean any patient data “generated and maintained by a health care provider,” without any limitation as to the physical location or department where it is kept. R.C. 3701.74(A)(8). We therefore remand this cause to the trial court to determine whether the hospital met its burden on a motion for summary judgment to show that it had produced Howard’s entire “medical record” in accordance with our decision.
A. Definition of “medical record” in R.C. 3701.74(A)(8)
{¶ 18} When interpreting a statute, this court’s paramount concern is legislative intent. State ex rel. United States Steel Corp. v. Zaleski, 98 Ohio St.3d 395, 2003-Ohio-1630, 786 N.E.2d 39, ¶ 12. “[T]he intent of the lawmakers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the lawmaking body, there is no occasion to resort to other means of interpretation.” Slingluff v. Weaver, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus. We apply the statute as written, Boley v. Goodyear Tire & Rubber Co., 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, ¶ 20, and we refrain from adding or deleting words when the statute’s meaning is clear and unambiguous, Armstrong v. John R. Jurgensen Co., 136 Ohio St.3d 58, 2013-Ohio-2237, 990 N.E.2d 568, ¶ 12.
{¶ 19} R.C. 3701.74(B) sets forth the procedure by which a “patient, a patient’s personal representative, or an authorized person” may “examine or obtain a copy of part or all of a medical record.” “Medical record” is defined as “data in any form that pertains to a patient’s medical history, diagnosis, prognosis, or medical condition and that is generated and maintained by a health care provider in the process of the patient’s health care treatment.” R.C. 3701.74(A)(8).
{¶ 20} The meaning of the word “maintain” lies at the heart of this dispute. The hospital argues that “maintain” connotes an exercise of discretion and a level of management that brings the data into a discrete set of records. Therefore, the *201 medical record, according to the hospital, consists of the information that the healthcare provider deems appropriate to maintain in a discrete location for the care of the patient. Griffith argues, consistent with the view of the Fifth District’s dissenting judge, that the statute does not authorize the hospital to limit the medical record to include only those records it sends to its medical-records department.
{¶21} The legislature did not define “maintain” in R.C. 3701.74. Moreover, the word has not “acquired a technical or particular meaning, whether by legislative definition or otherwise,” that we are required to apply here. R.C. 1.42. Therefore, to resolve the question, we look to the ordinary, common meaning of the word “maintain.” See Weaver v. Edwin Shaw Hosp., 104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶ 12.
{¶ 22} “Maintain” is defined as “[t]o continue in possession of.” Black’s Law Dictionary 1097 (10th Ed.2014). Contrary to the hospital’s assertion, the definition of “maintain” does not depend on a managerial decision to keep or preserve the data in a discrete location or file. Instead, the ordinary and common meaning conveys that the healthcare provider has made a decision to keep or preserve the data.
{¶ 23} R.C. 3701.74(A)(8) does not state that a medical record must be kept in a specific physical location. To interpret R.C. 3701.74(A)(8) as limiting a medical record to data, generally or in a discrete set, in the medical-records department would require us to insert words not used by the General Assembly. “In matters of construction, it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used.” Cleveland Elec. Illum. Co. v. Cleveland, 37 Ohio St.3d 50, 524 N.E.2d 441 (1988), paragraph three of the syllabus.
{¶ 24} By comparison, Ark.Code Ann. 16-46-402 defines “medical records” as “health care records * * * maintained by the medical records department of a * * * medical facility.” The Arkansas General Assembly expressed the intent that the record must be in the physical location of the medical-records department. The Ohio General Assembly did not.
{¶ 25} We therefore disagree with the reasoning of the Fifth District and conclude that the physical location of patient data is not relevant to the determination whether that data qualifies as a medical record under R.C. 3701.74(A)(8). Rather, the definition focuses on whether a healthcare provider made a decision to keep data that was generated in the process of the patient’s healthcare treatment and pertains to the patient’s medical history, diagnosis, prognosis, or medical condition.
*202 B. The hospital’s evidentiary burden
{¶ 26} We now consider whether the hospital met its burden on a motion for summary judgment to show that there was no genuine issue of material fact that it produced Howard’s entire medical record. See Civ.R. 56(C). A party seeking summary judgment “bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party’s claim.” Dresher v. Burt, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). The hospital argued in its motion for summary judgment that it had met its initial burden by producing a certified copy of Howard’s medical record as it existed in the medical-records department. According to the hospital, the May 6 cardiac-monitoring strips, which were printed after discharge at the direction of the risk-management department, did not meet the definition of “medical record” because they were not kept in the medical-records department.
{¶ 27} Reagan-Nichols testified that the data on the cardiac monitor is deleted 24 hours after discharge unless it is saved at the direction of a physician. If indeed saved at the direction of a physician before discharge, the cardiac-monitoring information — and other patient data saved by a healthcare provider but not kept in the medical-records department — would fall under the definition of “medical record.” However, because the proceedings below focused only on medical records kept in the hospital’s medical-records department, the record before us is insufficient to determine whether the hospital produced the entirety of Howard’s medical record. Therefore, we remand to the trial court to apply the definition of “medical record” as set forth in this decision, to order further proceedings if needed to develop the evidentiary record, and to make a determination whether the hospital has met its burden.
C. No requirement in R.C. 3701.74 to state a reason when requesting medical records
{¶ 28} Finally, we conclude that the plain language of R.C. 3701.74 does not require that a patient seeking a medical record state a reason for doing so. The Fifth District found that the purpose of R.C. 3701.74 is to “enable the patient to obtain his or her file in order, for example, to obtain a second opinion or transfer to another medical provider.” 2014-Ohio-1218, 2014 WL 1342988, ¶ 23. Justice Lanzinger’s dissenting opinion suggests that settlement of Griffith’s medical-malpractice action moots any further inquiry into the production of the medical record. In establishing a patient’s right of access to medical records, however, the General Assembly has not imposed upon the patient or the patient’s representative any burden of demonstrating a reason for accessing the medical record. *203 All that is required of a patient or a patient’s representative is to “submit to the health care provider a written request signed by the patient * * * dated not more than one year before the date on which it is submitted.” R.C. 3701.74(B).
III. Conclusion
{¶29} Because the Ohio General Assembly did not limit the definition of “medical record” in R.C. 3701.74(A)(8) to data in the medical-records department, the physical location of data is not relevant to the determination whether that data qualifies as a medical record. Instead, the definition focuses on whether a healthcare provider made a decision to keep data that was generated in the process of the patient’s healthcare treatment and that pertained to the patient’s medical history, diagnosis, prognosis, or medical condition. We hold that for purposes of R.C. 3701.74(A)(8), “maintain” means that the healthcare provider has made a decision to keep or preserve the data.
{¶ 30} The judgment of the court of appeals is reversed, and the cause is remanded to the trial court for proceedings consistent with this opinion.
Judgment reversed and cause remanded.
Pfeifer, French, and O’Neill, JJ., concur.
O’Connor, C.J., concurs in judgment only.
O’Donnell, J., dissents, with an opinion.
Lanzinger, J., dissents, with an opinion.