[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of 6011 Greenwich Windpark, L.L.C.,* Slip Opinion No. 2019-Ohio-2406.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-2406

IN RE APPLICATION OF 6011 GREENWICH WINDPARK, L.L.C., REGARDING ITS CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED ISSUED IN CASE NO. 13-990-EL-BGN; GREENWICH NEIGHBORS UNITED, APPELLANT; POWER SITING BOARD ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of 6011 Greenwich Windpark, L.L.C.,* Slip Opinion No. 2019-Ohio-2406.]

*Power Siting Board—Application to modify previously issued siting certificate for wind-powered electric-generation facility to add new turbine models—Power Siting Board's approval of new wind-turbine models was not an "amendment" of the certificate for purposes of applying the current turbine-setback requirements stated in R.C. 4906.20 and 4906.201—Power Siting Board reasonably interpreted R.C. 4906.20(B)(2)(c)'s wind-turbine-setback-waiver provision—R.C. 4906.07(B) gives Power Siting Board discretion in certain situations to determine whether to hold a hearing on an application to amend a siting certificate—Orders affirmed.*

(No. 2017-1375—Submitted March 5, 2019—Decided June 20, 2019.)

APPEAL from the Power Siting Board, No. 15-1921-EL-BGA.

_____

**O'CONNOR, C.J.**

{¶ 1} Appellant, Greenwich Neighbors United ("GNU"), appeals from orders of appellee Ohio Power Siting Board approving the application of 6011 Greenwich Windpark, L.L.C. ("Greenwich Windpark"), to add three new wind-turbine models to the list of turbines suitable for Greenwich Windpark's proposed wind farm in Huron County. GNU primarily argues that in approving the proposed changes, the board should have amended Greenwich Windpark's siting certificate and should have applied the enhanced minimum turbine-setback requirements applicable to any certificate "amendment" under the current versions of R.C. 4906.20 and 4906.201, which became effective September 15, 2014.

{¶ 2} For the reasons explained below, we conclude that the board's approval of Greenwich Windpark's application did not require an amendment of its certificate, and we therefore affirm the board's orders.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 3} The Power Siting Board has exclusive authority to issue a certificate of environmental compatibility and public need for construction, operation, and maintenance of a "major utility facility," R.C. 4906.01(B)(1), such as a wind-powered electric-generation facility, also known as a wind farm or wind park. *See* R.C. 4906.01(D), 4906.03, and 4906.13.

{¶ 4} In August 2014, the board approved Greenwich Windpark's application to construct a wind farm, subject to 53 conditions agreed to by Greenwich Windpark and the board's staff. According to the board's order, the proposed facility will be located on 4,650 acres of land leased from 26 landowners in Greenwich Township, Huron County—about 15 miles north of Mansfield. The wind farm will consist of up to 25 wind turbines and is designed to operate at an

aggregate capacity of 60 megawatts and to generate 210,000 megawatts of electricity per year. In its original application for the certificate, Greenwich Windpark proposed only one turbine model for its project.

{¶ 5} In November 2015, Greenwich Windpark initiated a new board proceeding by filing an application to amend its certificate. Greenwich Windpark's application noted that turbine technology had advanced since it initially requested a certificate, and it therefore sought to add three new turbine models to the list of acceptable turbines for its wind farm.[1] Greenwich Windpark's application also noted that two of the new turbine models were slightly larger than the certified model but none of the turbine locations would change and that all new models would either comply with the minimum setbacks in place when the board originally issued Greenwich Windpark's certificate or the turbines were subject to setback waivers that Greenwich Windpark had obtained in the certification case.

{¶ 6} Although GNU had not participated in the original certification proceeding, GNU intervened in the newly filed matter. According to GNU, some of its members own property near the proposed wind farm and it filed comments and objections opposing Greenwich Windpark's application.

{¶ 7} The board's staff investigated Greenwich Windpark's application and, in April 2016, issued a report recommending approval of the proposed turbine changes. In May 2016, the board approved Greenwich Windpark's application without holding a hearing, and in August 2017, the board denied GNU's request for a rehearing.

{¶ 8} GNU thereafter commenced this appeal, raising six assignments of error. We granted Greenwich Windpark's motion for leave to intervene to defend

---

1. In a supplemental application, Greenwich Windpark withdrew one of the proposed new turbine models and replaced it with another comparable model. For purposes of this appeal, we will refer to Greenwich Windpark's initial amendment application and supplemental application as one application.

the board's orders. 151 Ohio St.3d 1422, 2017-Ohio-8365, 84 N.E.3d 1061. We later dismissed GNU's second assignment of error. 152 Ohio St.3d 1403, 2018-Ohio-723, 92 N.E.3d 876.

## II. STANDARD OF REVIEW

{¶ 9} We will reverse, modify, or vacate an order of the Power Siting Board "only when our review of the record reveals that the order is unlawful or unreasonable." *In re Application of Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, ¶ 7; *see* R.C. 4906.12 (incorporating the standard of review from R.C. 4903.13). We will not reverse or modify a board's order as to questions of fact when the record contains sufficient probative evidence to show that the order was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Champaign Wind* at ¶ 7. As to questions of law, we have complete and independent power of review in appeals from the board. *Id*.

## III. ANALYSIS

### A. Proposition of law No. 1: whether the board acted unlawfully or unreasonably by refusing to subject Greenwich Windpark's application to the current minimum setback requirements in R.C. 4906.20 and 4906.201

*1. The relevant statutory framework and the board's orders*

{¶ 10} The primary issues on appeal involve the interpretation of R.C. 4906.20 and 4906.201—power-siting statutes applicable only to wind farms. R.C. 4906.20 applies to an "economically significant wind farm," which is a wind farm capable of operating at an aggregate capacity between 5 and 50 megawatts, R.C. 4906.13(A). R.C. 4906.201 applies to a wind farm capable of operating at an aggregate capacity of 50 megawatts or more, such as Greenwich Windpark's project. R.C. 4906.201(A), however, incorporates the "minimum setback requirements" established by the board under R.C. 4906.20(B)(2).

**{¶ 11}** In 2014—after the board had originally certified Greenwich Windpark's wind farm—the legislature amended R.C. 4906.20 and 4906.201 to significantly increase the minimum turbine-setback requirements for new wind-farm certificates. In addition, the legislature enacted R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2), both of which state that those new setback requirements apply to "[a]ny amendment made to an existing certificate" after the effective date of the new enhanced setbacks—that is, September 15, 2014. The legislature also instructed in both statutes, however, that the amendments to R.C. 4906.20 and 4906.201 "shall not be construed to limit or abridge any rights or remedies in equity or under the common law."

**{¶ 12}** In November 2015, Greenwich Windpark filed an application seeking to amend its certificate to, as described above, add three new turbine models. Although the board approved the application, the board concluded that Greenwich Windpark's requested turbine changes did not constitute an "amendment" for purposes of R.C. 4906.20 and 4906.201. According to the board, the term "amendment" in those two statutes has a very specific meaning based on the way the legislature chose to word the statutes:

> The Board interprets the amendment addressed in R.C. 4906.20 and 4906.201 to apply specifically in those instances where an amendment results in a substantial change in the location of a turbine or an amendment results in a material increase in an environmental impact caused by a turbine that is not already addressed by conditions placed on the certificate.

Power Siting Bd. No. 15-1921-EL-BGA, 2016 Ohio PUC LEXIS 471, *10 (May 19, 2016).

**{¶ 13}** Relying on that definition, the board concluded that Greenwich Windpark's "application [did] not constitute an amendment that triggers the enhanced setbacks under R.C. 4906.201(B)(2)," because the application did not relocate any turbines or create any new environmental impacts beyond those already addressed in the original certificate. *Id.* at *22.

**{¶ 14}** In its entry denying GNU's application for rehearing, the board further clarified its interpretation of R.C. 4906.20 and 4906.201. Because those statutes do not define the meaning of the phrase "[a]ny amendment made to an existing certificate," the board noted that it "used its discretion and expertise to determine what qualifies" as an amendment, in the same way it must create parameters for undefined terms when fulfilling its statutory duty to " 'prescribe reasonable regulations regarding any wind turbines * * *, including, but not limited to, their * * * *change*, *alteration*, maintenance, removal, use, or enlargement.' " (Emphasis added by the board.) Power Siting Bd. No. 15-1921-EL-BGA, 2017 Ohio PUC LEXIS 726, *12-13 (Aug. 17, 2017), quoting R.C 4906.20(B)(2). "[P]roject changes that are adequately addressed by existing certificate conditions," the board concluded, "do not require an amendment to the original certificate." *Id.* at *16. To support its interpretation, the board noted that construction of wind farms is often delayed for years after initial certification, *id.* at *15, and that a change it sees "with frequency" involves updates to turbine models "that could serve to make wind turbines more efficient and in many circumstances, less obtrusive to surrounding property owners," *id.* at *16. Applying the enhanced setbacks to every type of minor change "could prove detrimental to the originally certificated project." *Id.* The board noted that "[n]ot every proposed change to a major utility facility requires an amendment to an existing certificate." *Id.* at *14.

**{¶ 15}** The board therefore refused to adopt GNU's interpretation of "amendment"; the board reasoned that GNU's interpretation "would serve to eliminate existing wind farm projects from commerce for minor modifications."

*Id.* at *17. The board noted that if the General Assembly had intended such a result, that intent "could have been explicitly stated." *Id*. And considering that the legislature has entrusted the board with the responsibility of interpreting the words "change" and "alteration" regarding turbines in R.C. 4906.20(B)(2), the board concluded that it is required to use "its expertise of the siting process to interpret these words in a manner that recognizes the practicality of siting commercial wind farms while also adhering to the words of the statute." *Id.* at *17. Indeed, here it was clear to the board that upgrading the turbine models was a minor change that merely allowed Greenwich Windpark "to take advantage of technological advancements." *Id*. The board further concluded that its interpretation of "[a]ny amendment made to an existing certificate" is consistent with the legislature's instruction that the amendments to R.C. 4906.20 and 4906.201 enacted by the General Assembly in 2014 " 'shall not be construed to limit or abridge any rights or remedies in equity or under the common law.' " *Id.* at *14, quoting R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2).

{¶ 16} On appeal, GNU argues that the board acted unreasonably and unlawfully by refusing to subject Greenwich Windpark's application to the current minimum turbine setbacks applicable to any certificate "amendment." GNU contends that our recent decision in *In re Application of Black Fork Wind Energy, L.L.C.*, ___ Ohio St.3d ___, 2018-Ohio-5206, ___ N.E.3d ___, controls the outcome here and that under the plain and ordinary meaning of the term "amendment," Greenwich Windpark sought and received an amendment to its certificate, which triggered application of the enhanced setback requirements under R.C. 4906.201(B)(2).

### 2. Analysis of the issue

{¶ 17} We conclude that the board reasonably determined that Greenwich Windpark's turbine changes here did not require an "amendment" to its certificate for purposes of applying the enhanced setback requirements in R.C. 4906.20 and

4906.201. Although our recent decision in *Black Fork* guides our analysis in this case, it does not require a conclusion that the approved turbine changes amounted to an "amendment" for purposes of R.C. 4906.20 and 4906.201.

{¶ 18} The issue in *Black Fork* was whether the board could lawfully extend the commencement-of-construction deadline in a siting certificate by granting a party's motion rather than complying with the statutory process for amending a certificate, which requires an application, staff investigation, and staff investigative report. *Id.* at ¶ 1-2, 12-14, 20-22. The board had argued that changes to a certificate's procedural timelines did not require an "amendment" and, in support, pointed to its long-standing administrative practice—in a range of power-siting matters—of extending certificates by granting motions. *Id.* at ¶ 16. We reviewed the statutes and rules applicable to amending a siting certificate and concluded that the board acted unlawfully in granting Black Fork's motion rather than following the statutory procedures for amending a certificate. *Id.* at ¶ 20, 30.

{¶ 19} *Black Fork* is distinguishable because it involved the meaning of "amendment" for purposes of R.C. 4906.06 and 4906.07, two general statutes applicable to all power-siting matters. Because the legislature had not defined "amendment" as it is used in R.C. 4906.06(E) and 4906.07(B), we looked to the common, ordinary, and accepted meaning of the term to resolve the question before us. "In construing statutes, it is customary to give words their plain ordinary meaning unless the legislative body has clearly expressed a contrary intention." *Youngstown Club v. Porterfield*, 21 Ohio St.2d 83, 86, 255 N.E.2d 262 (1970).

{¶ 20} This case has a different procedural posture than *Black Fork* and therefore warrants a separate analysis. In this case, rather than filing a motion like the wind-farm developer did in *Black Fork*, Greenwich Windpark filed an application to amend its certificate. Making revisions by application requires a more stringent process than making them by motion. For example, Greenwich Windpark gave public notice of the application. Interested parties were allowed to

intervene in the action to address the proposed changes to the wind farm. And the board's staff conducted a full investigation into the substantive differences between the turbine approved in the original certificate and those proposed in the application. After following the statutory procedures for amending a certificate, the board concluded that the proposed changes did not constitute an amendment for purposes of R.C. 4906.20 and 4906.201. Those two statutes are specific to wind farms. The General Assembly, through R.C. 4906.20 and 4906.201, vested the board with broad authority to regulate wind turbines and their associated facilities, including changes and alterations to turbines. R.C. 4906.20(B)(2) specifically requires the board to "prescribe reasonable regulations regarding any wind turbines and associated facilities of an economically significant wind farm, including, but not limited to, their location, erection, construction, reconstruction, *change*, *alteration*, maintenance, removal, use, or enlargement." (Emphasis added.)

{¶ 21} The board here found that Greenwich Windpark's new turbine models were "adequately covered by the existing conditions of the certificate" and that the impacts of the proposal did "not require a change to the existing certificate." 2017 Ohio PUC LEXIS 726 at *13. The legislature delegated regulatory authority to the board to regulate wind turbines. In addition, the legislature in R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) expressly instructed that the 2014 amendments to R.C. 4906.20 and 4906.201 "shall not be construed to limit or abridge any rights or remedies in equity or under the common law"—another difference from the statutes at issue in *Black Fork*. Accordingly, and pursuant to its statutory authority on these issues, the board considered the facts and the parties' arguments and determined that the proposed change did not constitute an amendment under R.C. 4906.20 or 4906.201.

{¶ 22} Although the dissenting opinion asserts that our analysis here must be identical to that in *Black Fork*, the dissent fails to account for the differences in the statutes at issue in the two cases. " '[T]he natural meaning of * * * words is not

always conclusive as to the construction of statutes.' " *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917), quoting *State v. Budd*, 65 Ohio St. 1, 5, 60 N.E. 988 (1901). And although it is generally true that the words and phrases used by the General Assembly will be construed in their usual, ordinary meaning, that is not so when a contrary intention of the legislature clearly appears. *S. Sur. Co. v. Std. Slag Co.*, 117 Ohio St. 512, 519, 159 N.E. 559 (1927). Here, we have identified several important differences between the relevant statutes in this case, R.C. 4906.20 and 4906.201, and the ones analyzed in *Black Fork*, R.C. 4906.06 and 4906.07, that require us to independently construe the term amendment. The dissent complains that "[t]hese distinctions are strained and unpersuasive," dissenting opinion at ¶ 68, while failing to make any effort to account for those differences. Instead, the dissent offers an interpretation that ignores the context of the statutory scheme and is unworkable in practice.

{¶ 23} Our decision in *Black Fork* should not be interpreted as requiring that *every* proposed change to a wind farm's certificate—no matter how minor or immaterial—is an amendment for purposes of applying the enhanced setback requirements. In this case, the board adopted a reasonable and practical approach for determining when an amendment is necessary for purposes of R.C. 4906.20 and 4906.201. Under the circumstances, GNU has not demonstrated that the board's decision here was unlawful or unreasonable.

{¶ 24} Accordingly, we reject GNU's first proposition of law.[2]

---

2. Because we dismissed the second assignment of error stated in GNU's notice of appeal, there is no second proposition of law in GNU's merit brief.

## B. Proposition of law No. 3: whether the board unlawfully or unreasonably interpreted the setback-waiver provision in R.C. 4906.20(B)(2)(c) and whether the board failed to establish required procedural rules

### 1. The relevant statutory framework and the board's orders

{¶ 25} R.C. 4906.20(B)(2)(c) provides that the statutory minimum setbacks apply "in all cases except those in which all owners of property adjacent to the wind farm property waive application of the setback to that property pursuant to a procedure the board shall establish by rule and except in which, in a particular case, the board determines that a setback greater than the minimum is necessary."

{¶ 26} In its order issuing Greenwich Windpark's original certificate, the board noted that some of Greenwich Windpark's proposed turbines fell within the minimum setbacks but that Greenwich Windpark had either obtained or was in the process of obtaining waivers from the landowners adjacent to each of those particular turbines. During the proceedings in this matter, GNU argued that Greenwich Windpark had failed to secure all required waivers from neighboring landowners. The board rejected GNU's argument and concluded that Greenwich Windpark had already obtained the necessary waivers in the original certification case and that no additional waivers were necessary as a result of adding the new turbine models.

{¶ 27} On appeal, GNU argues that the board acted unlawfully by permitting Greenwich Windpark to waive the minimum setback requirements without first obtaining waivers from "all owners" of property adjacent to any portion of the proposed wind farm. According to GNU, the meaning of "all" in R.C. 4906.20(B)(2)(c) is "obvious" and requires that "each and every owner of property with land adjacent to the wind farm property" must sign a waiver in order for any turbine to be built within a minimum setback. GNU also argues that it was "legally impossible" for Greenwich Windpark to secure setback waivers because

the board had failed to comply with its statutory duty to establish rules outlining the procedure for obtaining a waiver.

{¶ 28} In response, the board asserts that R.C. 4906.20(B)(2)(c) requires a waiver only from those landowners who own property adjacent to a turbine that falls within the minimum setback. According to the board, the purpose of the statute is to give a landowner the right to consent for a turbine to be sited within the minimum setback from his or her property and GNU's "all or nothing" interpretation is contrary to the statute's intent.

*2. Analysis of the issue*

{¶ 29} We conclude that the board's decision relied on the only reasonable interpretation of R.C. 4906.20(B)(2)(c).

{¶ 30} R.C. 4906.20(B)(2)(c) sets forth an exception to the minimum setback when "all owners of property adjacent to the wind farm property waive application of the setback to that property." A property owner may "waive application of the setback to that property" only if he or she has something to waive—that is, if the turbine adjacent to his or her property falls within the minimum setback. If an owner's property is adjacent to a turbine that *exceeds* the minimum setback or is near a portion of the wind-farm property that does not have a turbine—such as the maintenance facility or the substation—there would be no setback to waive. Accordingly, by use of the phrase "waive application of the setback to that property," the legislature indicated that only those property owners with rights to waive are required to execute a waiver to permit a turbine to be sited inside the minimum setback distance. The General Assembly must be "presumed to know the meaning of words, to have used the words of a statute advisedly and to have expressed legislative intent by the use of the words found in the statute." *Wachendorf v. Shaver*, 149 Ohio St. 231, 237, 78 N.E.2d 370 (1948).

{¶ 31} GNU's interpretation of R.C. 4906.20(B)(2)(c) is untenable. Under GNU's theory, an owner of property adjacent to any portion of a wind farm, which

12

can cover thousands of acres and be the equivalent of dozens of square miles, could prevent the construction of a turbine miles away. Indeed, GNU suggests that R.C. 4906.20(B)(2)(c) gives one landowner the right to "veto" another landowner's decision to waive application of the minimum setback to the second landowner's property. But nothing in the statutory scheme supports permitting that type of interference with a property owner's rights. Rather, R.C. 4906.20(B)(2)(c) provides a process by which a property owner may waive the minimum setback "to *that* property." (Emphasis added.) In other words, the statute allows a turbine to be placed within the minimum setback but *only if* the neighboring landowners who are directly impacted have waived application of the setback to their particular properties.

{¶ 32} In addition, GNU's heavy reliance on the term "all" is misplaced. "Parsing individual words is useful only within a context." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 12. Here, the term "all" in R.C. 4906.20(B)(2)(c) modifies "owners," which ensures that every owner of property located adjacent to a turbine within the minimum setback waives application of the setback "to that property."

{¶ 33} Finally, GNU has not sufficiently developed its argument that it was "legally impossible" for Greenwich Windpark to secure setback waivers due to the board's alleged failure to establish procedural rules governing waivers. At the time the board issued the orders on appeal, it had adopted rules regarding setback waivers. *See* former Ohio Adm.Code 4906-17-08(C)(1)(c)(iii), 2008-2009 Ohio Monthly Record 2-3671, effective May 7, 2009, and former Ohio Adm.Code 4906-4-08(C)(2)(d), 2015-2016 Ohio Monthly Record 2-4868, effective June 26, 2016. GNU is apparently dissatisfied with the substance of those rules because they did not accord with GNU's interpretation of R.C. 4906.20(B)(2)(c). But the rules nevertheless existed. GNU bears the burden of demonstrating reversible error, but it has failed to develop this argument beyond conclusory statements. *See In re*

*Complaint of Toliver v. Vectren Energy Delivery of Ohio, Inc.*, 145 Ohio St.3d 346, 2015-Ohio-5055, 49 N.E.3d 1240, ¶ 30.

{¶ 34} Accordingly, we reject GNU's third proposition of law.

## C. Proposition of law No. 4: whether the board acted unlawfully or unreasonably by failing to hold a hearing on Greenwich Windpark's application or by failing to take other actions

*1. The relevant statutory framework and the board's orders*

{¶ 35} R.C. 4906.07(B) requires the board to hold a hearing on an application to amend a certificate "if the proposed change in the facility would result in any material increase in any environmental impact of the facility or a substantial change in the location of all or a portion of such facility."

{¶ 36} As noted above, Greenwich Windpark filed an application for an amendment of its certificate. Although the board ultimately determined that Greenwich Windpark's proposed changes did not require an "amendment" for purposes of R.C. 4906.20 and 4906.201, the board nonetheless treated Greenwich Windpark's filing as an amendment application for purposes of review and compliance with the procedural requirements of R.C. 4906.06 and 4906.07. In both of the orders on appeal, the board concluded that a hearing was unnecessary under R.C. 4906.07(B) because "there [was] no material increase in any environmental impact of the facility and no substantial change in any portion of the facility's location." 2016 Ohio PUC LEXIS 471 at *20; 2017 Ohio PUC LEXIS 726 at *7.

{¶ 37} On appeal, GNU argues that the board was required to hold a hearing and that by refusing to do so, the board violated R.C. 4906.07(B) and deprived GNU of due process.

*2. Analysis of the issue*

{¶ 38} GNU has failed to establish that it was entitled to a hearing in this case.

{¶ 39} R.C. 4906.07(B), especially when read in the context of the entire statute, gives the board some discretion to determine when a hearing is necessary. R.C. 4906.07(B) provides that upon receipt of an amendment application, the board shall hold a hearing "if" the proposal would result in certain changes to the facility. The wording of the statute presupposes that a hearing is not always necessary and accordingly demonstrates that the legislature intended to authorize the board to rule on some amendment applications without the delay of a hearing. And in a prior wind-farm case, a plurality of this court explained that under R.C. 4906.07(B), the board retains "authority to determine what is subject to hearing," because "not every issue" requires a hearing, "as that would be unworkable." *In re Application of Buckeye Wind, L.L.C.*, 131 Ohio St.3d 449, 2012-Ohio-878, 966 N.E.2d 869, ¶ 30; *see also id.* at ¶ 31 (acknowledging that a hearing on an amendment application is available when significant changes are proposed to the certificate).

{¶ 40} Here, after reviewing Greenwich Windpark's application, GNU's comments and objections to the application, and the investigative report prepared by the board's staff, the board determined that Greenwich Windpark's proposed changes did not require a hearing under R.C. 4906.07(B). On appeal, GNU has not demonstrated that the board's factual determination was manifestly against the weight of evidence or clearly unsupported by the record.

{¶ 41} Specifically, GNU claims that a hearing was required because the three new turbine models "will result in substantial changes to the facility," and GNU points to differences in size, noise, shadow flicker (occurring when the sun shines through the rotating blades of a turbine), and ice throw between the new turbines and the originally certified model. The board's staff, however, reviewed those differences and concluded in its report filed with the board that adding the three turbine models "would not require a change in location of any turbine sites" and that the conditions of the original certificate—plus a minor clarification to one

condition—were "adequate to ensure that adverse environmental impacts would continue to be minimized for this project." GNU has not proved otherwise.

**{¶ 42}** For example, after reviewing the potential noise impact of the new turbines, the board's staff noted that even if the new turbines produced slightly more noise than the originally certified model, the new models would adhere to the noise-limit condition imposed in the original certificate. GNU has not explained how a minimal increase in noise amounts to a "material increase in any environmental impact" requiring a hearing under R.C. 4906.07(B)—especially considering that the board's staff concluded that the new turbine models will adhere to the original noise-limit condition.

**{¶ 43}** GNU has also failed to establish any due-process violation. In the public-utility context, "we have repeatedly held that there is no constitutional right to notice and hearing in utility-related matters if no statutory right to a hearing exists." *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 38; *see also Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 248, 638 N.E.2d 550 (1994) ("the right to participate in a ratemaking proceeding is statutory, not constitutional"). GNU attempts to distinguish this precedent by arguing that because property rights are involved here—rather than public-utility-rate matters—GNU had a constitutional right to a hearing. To support this argument, GNU cites *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, in which we held that owners of property adjacent to property rezoned by a foreign municipality had standing to bring a declaratory-judgment action challenging the constitutionality of the zoning action, *id.* at syllabus.

**{¶ 44}** GNU has not adequately explained how *Moore* supports its theory that it had a constitutional right to a hearing merely because Greenwich Windpark requested turbine changes to its previously certified wind farm. "[I]t is not generally the proper role of this court to develop a party's arguments." *In re*

*Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 19. By citing *Moore*, GNU seems to be challenging Greenwich Windpark's ability to construct a wind farm at all. To do that, it should have participated in the original proceeding when the certificate was issued. Absent further explanation from GNU, any legal right that it had to a hearing on Greenwich Windpark's amendment application stemmed directly from R.C. 4906.07(B). And if GNU had no right to a hearing under that statute, it also had no constitutional right to one.

{¶ 45} Under this proposition of law, GNU also asserts that the board failed to require public notice of Greenwich Windpark's application, failed to hold informational and local public hearings, failed to respond to GNU's objections, and violated R.C. 4906.10(A), 4906.11, and 4906.12. GNU, however, has failed to develop these arguments or otherwise explain how the board violated these statutes. "Unsupported legal conclusions do not demonstrate error." *Toliver*, 145 Ohio St.3d 346, 2015-Ohio-5055, 49 N.E.3d 1240, at ¶ 30.

{¶ 46} For these reasons, we reject GNU's fourth proposition of law.

**D. Proposition of law No. 5: whether the board acted unlawfully or unreasonably by limiting the scope of GNU's intervention**

{¶ 47} In GNU's reply brief, it acknowledges that this issue is "moot." Because the board and GNU ultimately agree that the board did not limit the scope of GNU's intervention, there is no actual controversy on this point. We therefore do not address GNU's fifth proposition of law.

**E. Proposition of law No. 6: whether the board acted unlawfully or unreasonably by stating that it had promulgated the rules that the General Assembly required it to adopt**

{¶ 48} R.C. 4906.20(B)(2) requires the board to "prescribe reasonable regulations regarding any wind turbines and associated facilities of an economically significant wind farm." In the order granting Greenwich Windpark's amendment

application, the board noted that it had "promulgated the required rules" in the relevant portions of the Ohio Administrative Code. 2016 Ohio PUC LEXIS 471 at *8. On appeal, GNU takes issues with that statement of the board. According to GNU, the board failed to adopt "reasonable substantive regulations" and instead promulgated rules "devoid of any reasonable standard," which has resulted in the board's operating in an "ad hoc" manner that relies too much on studies and methodologies provided by wind-farm developers.

{¶ 49} GNU's argument is outside the scope of this appeal. If GNU is dissatisfied with the content of the board's administrative rules, it should have challenged those rules in a rulemaking proceeding. The issue here is whether the board's approval of Greenwich Windpark's amendment application was unlawful or unreasonable—not whether the board properly complied with the legislative mandate to establish reasonable regulations for wind farms.

{¶ 50} We therefore reject this proposition of law.

### F. Greenwich Windpark's motion to strike

{¶ 51} After the parties completed briefing, Greenwich Windpark moved to strike the supplement GNU filed with its reply brief and the portions of the reply brief that rely on that supplement. Greenwich Windpark argues that the supplement contains materials that are not part of the record. Indeed, most of the materials are dated after the board issued the orders on appeal.

{¶ 52} "We generally strike evidence submitted by a party to a case here on appeal when the evidence was not submitted below." *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 154 Ohio St.3d 449, 2018-Ohio-2046, 114 N.E.3d 1185, ¶ 41, citing *Orange City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 152 Ohio St.3d 325, 2017-Ohio-8817, 96 N.E.3d 223, ¶ 11, fn. 3.

{¶ 53} The challenged documents here refer to facts outside the record. Because appellate counsel cannot properly refer to such facts—and GNU has not identified a compelling reason to do so in this case—we grant the motion to strike

18

the documents that are not part of the record and the portions of GNU's reply brief that rely on those documents.

## IV. CONCLUSION

{¶ 54} For the foregoing reasons, we affirm the board's orders and grant Greenwich Windpark's motion to strike.

Orders affirmed.

FRENCH, FISCHER, and DONNELLY, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by DEWINE and STEWART, JJ.

_____

**KENNEDY, J., dissenting.**

{¶ 55} Because the majority abdicates this court's judicial duty and authority to "say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177, 2 L.Ed. 60 (1803), when it defers to appellee Ohio Power Siting Board's interpretation of two unambiguous statutes, R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2), I dissent. Contrary to the majority's analysis, the General Assembly—the ultimate arbiter of public policy in this state—has unambiguously provided that *any amendment* to a wind farm's certificate shall be subject to the new setback provisions enacted in those statutes.

{¶ 56} In this case, the board granted the request of 6011 Greenwich Windpark, L.L.C., for "an Amendment to its Certificate of Environmental Compatibility" to add three new wind-turbine models for use on its proposed wind farm. That alteration of the certificate is an "amendment" within the plain meaning of R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2), and it is therefore subject to the new, more restrictive turbine-setback requirements in R.C. 4906.20 and 4906.201. And because the board lacks statutory authority to decide on a case-by-case basis whether an amendment is significant enough that the new setbacks apply, its orders

declining to apply the current setbacks to the amendment of Greenwich Windpark's certificate should be reversed.

**Statutory Construction**

**{¶ 57}** This case presents a straightforward question of statutory interpretation. Our duty in construing a statute is to determine and give effect to the intent of the General Assembly as expressed in the language it enacted. *Griffith v. Aultman Hosp.*, 146 Ohio St.3d 196, 2016-Ohio-1138, 54 N.E.3d 1196, ¶ 18; *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 20. A court therefore cannot insert language into a statute under the guise of statutory interpretation. *Doe v. Marlington Local School Dist. Bd. of Edn.*, 122 Ohio St.3d 12, 2009-Ohio-1360, 907 N.E.2d 706, ¶ 29. Instead, when the language of a statute is plain and unambiguous and conveys a clear and definite meaning, our role is to apply it as written. *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 14.

**{¶ 58}** Effective September 15, 2014, the General Assembly amended R.C. 4906.20 and 4906.201 as part of 2014 Am.Sub.H.B. No. 483 ("H.B. 483"). This legislation, specifically R.C. 4906.20(B)(2)(a), had the effect of significantly increasing the minimum setback for wind turbines from a wind farm's property lines. Although these more restrictive setbacks do not apply to certificates, certificate amendments, and qualifying certificate applications in existence prior to the effective date of H.B. 483, the General Assembly expressly provided:

> Any amendment made to an existing certificate after the effective date of the amendment of this section by H.B. 483 of the 130th general assembly, shall be subject to the setback provision of this section as amended by that act. The amendments to this section by that act shall not be construed to limit or abridge any rights or remedies in equity or under the common law.

R.C. 4906.201(B)(2). The General Assembly in H.B. 483 also codified this same provision as R.C. 4906.20(B)(2)(b)(ii).

{¶ 59} We recently examined the statutory scheme for amending a certificate in *In re Application of Black Fork Wind Energy, L.L.C.*, ___ Ohio St.3d ___, 2018-Ohio-5206, ___ N.E.3d ___. The issue in that case was whether altering the certificate to extend the time for the holder to commence construction of the wind farm amounted to an amendment of the certificate. We explained that the word "amendment" has a plain and ordinary meaning:

> *Black's Law Dictionary* defines "amendment" as "[a] formal and usu. minor revision or addition proposed or made to a statute, constitution, pleading, order, or other instrument; specif., a change made by addition, deletion, or correction; esp., an alteration in wording." *Black's Law Dictionary* 98 (10th Ed.2014). *Webster's Third New International Dictionary* defines "amendment" as the "act of amending esp. for the better; correction of a fault or faults; reformation," "the process of amending (as a motion, bill, act, or constitution)," and "an alteration proposed or effected by such process." *Webster's Third New International Dictionary* 68 (2002). And "amend" is defined as "to change or alter in any way esp. in phraseology" or "to alter (as a motion, bill, or law) formally by modification, deletion, or addition." *Id*.

*Id*. at ¶ 18.

{¶ 60} Applying this plain and ordinary meaning, we concluded that the Power Siting Board had amended a condition of the certificate "by changing the compliance deadline." *Id*. at ¶ 19. We also noted that "had the board treated the

motion for an extension as an application for an amendment, the current setback provisions in R.C. 4906.20 and 4906.201 may have been triggered." *Id.* at ¶ 25.

{¶ 61} As we have already decided in *Black Fork Wind Energy*, an "amendment" is simply a change of or an alteration to a document such as an order of the board granting a certificate. It can be a minor revision or even something as small as an alteration in wording. ___ Ohio St.3d ___, 2018-Ohio-5206, ___ N.E.3d ___, at ¶ 21. Nothing in the word's plain meaning indicates that the existence of an amendment is a matter of degree or interpretation or that only a significant change constitutes an amendment.

{¶ 62} Moreover, the current setbacks apply to "[*a*]*ny amendment*." (Emphasis added.) R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2). " ' "Any" means "one or some indiscriminately of whatever kind." ' " *Weiss v. Pub. Util. Comm.*, 90 Ohio St.3d 15, 17, 734 N.E.2d 775 (2000), quoting *State ex rel. Purdy v. Clermont Cty. Bd. of Elections*, 77 Ohio St.3d 338, 340, 673 N.E.2d 1351 (1997), quoting *Webster's Third New International Dictionary* 97 (1971). As we recently explained in *Chesapeake Exploration, L.L.C. v. Buell*, "the use of the term 'any' in a phrase encompasses 'every' and 'all' examples of the subject described." 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 34. Because any amendment includes *all* amendments and *every* amendment, it necessarily includes a minor amendment as well as a more significant one.

{¶ 63} Applying R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2), and in accordance with our analysis in *Black Fork Wind Energy*, the modification of Greenwich Windpark's certificate to add new turbine models to the one previously approved for its wind farm is an amendment to that certificate.

{¶ 64} This conclusion is buttressed by uncodified law enacted by the General Assembly. Uncodified law is the law of Ohio, but because it is has limited duration or operation, it is not assigned a permanent section number in the Revised

Code. *Maynard v. Eaton Corp.*, 119 Ohio St.3d 443, 2008-Ohio-4542, 895 N.E.2d 145, ¶ 7.

{¶ 65} Effective September 29, 2015, Section 749.20 of 2015 Am.Sub.H.B. No. 64 ("H.B. 64") provided a grace period of 180 days in which a certificate could be amended to change a wind farm's turbines without triggering the new setbacks enacted by H.B. 483, "[n]otwithstanding division (B)(2)(b)(ii) of section 4906.20 of the Revised Code and division (B)(2) of section 4906.201 of the Revised Code." The grace period applied when "[t]he sole purpose of the amendment [was] to make changes to one or more turbines that [were] approved under the existing certificate but [had] not yet been installed" and when other conditions were met, including that the new turbines be more efficient or otherwise more technologically advanced, that the number of turbines not be increased, and that their locations be the same as those established by the certificate. The General Assembly therefore recognized that a certificate is amended for purposes of R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) when new turbine models are added or substituted. Otherwise, if upgrading the turbine models that may be used on a wind farm did not require an amendment of the certificate, there would have been no reason for the General Assembly to enact Section 749.20 of H.B. 64 as an exception to that requirement. *See Rhodes v. New Philadelphia*, 129 Ohio St.3d 304, 2011-Ohio-3279, 951 N.E.2d 782, ¶ 23 ("We must give effect to every term in a statute and avoid a construction that would render any provision meaningless, inoperative, or superfluous").

{¶ 66} For these reasons, the board's interpretation of R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2)—that only a significant amendment triggers the new setbacks—is irreconcilable with the language that the legislature enacted.

### *Black Fork Wind Energy* **Is Not Distinguishable**

{¶ 67} Notably, in *Black Fork Wind Energy*, we rejected the board's argument that it has broad discretion to determine whether a particular change to a

certificate is an "amendment" and instead applied the plain and ordinary meaning of the word "amendment" as a change or alteration of the certificate. ___ Ohio St.3d ___, 2018-Ohio-5206, ___ N.E.3d ___, at ¶ 16, 19. The majority, however, attempts to distinguish *Black Fork Wind Energy* "because it involved the meaning of 'amendment' for purposes of R.C. 4906.06 and 4906.07, two general statutes applicable to all power-siting matters," majority opinion at ¶ 19, while R.C. 4906.20 and 4906.201 "are specific to wind farms," *id*. at ¶ 20. The majority also points out that R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) state that the amendments enacted by H.B. 483 "shall not be construed to limit or abridge any rights or remedies in equity or under the common law" while R.C. 4906.06 and 4906.07 do not contain that language. *Id.* at ¶ 21. The majority claims that the statutes at issue in this case therefore "warrant[] a separate analysis." *Id.* at ¶ 20.

{¶ 68} These distinctions are strained and unpersuasive. The fact that R.C. 4906.20 and 4906.201 apply specifically to wind farms is a distinction without a difference; R.C. 4906.20(B)(1) expressly incorporates the statutory procedures for amending a certificate to cover wind farms, stating that the board must adopt rules that "provide for an application process for certificating economically significant wind farms that is identical to the extent practicable to the process applicable to certificating major utility facilities under sections 4906.06, 4906.07, 4906.08, 4906.09, 4906.10, 4906.11, and 4906.12 of the Revised Code." All of these statutes are part of the same statutory scheme.

{¶ 69} Similarly, the majority fails to explain why it matters that the amendments enacted by H.B. 483 "shall not be construed to limit or abridge any rights or remedies in equity or under the common law," R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2). No rights or remedies in equity or under the common law are in play here. And in any case, when a statute is plain and unambiguous, there is nothing to construe. *Zumwalde v. Madeira & Indian Hill Joint Fire Dist.*, 128 Ohio St.3d 492, 2011-Ohio-1603, 946 N.E.2d 748, ¶ 22.

**{¶ 70}** Putting these false distinctions aside reveals that at the core of the majority's analysis is the assertion that the word "amendment" can mean something different in R.C. 4906.06 and 4906.07 than it does in R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2). But we should not assume that the General Assembly intended to give different meanings to the same word relating to the same subject matter in the same statutory scheme. *See In re Lord Baltimore Press, Inc.*, 4 Ohio St.2d 68, 73, 212 N.E.2d 590 (1965). Nothing in the language that the General Assembly enacted supports the view that a proposed change to the certificate is an amendment triggering the statutory procedures for amending a certificate but at the same time not an amendment for purposes of applying the current setbacks. The majority cannot have it both ways.

**{¶ 71}** Stare decisis is most compelling when precedent involves statutory construction. *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 6, 539 N.E.2d 103 (1989). And because *Black Fork* is not distinguishable on any genuine and material basis, its holding should provide the rule of decision in this case.

### Deference to the Board

**{¶ 72}** Although it avoids using the word "deference" and addressing any of our caselaw explaining when it is appropriate to defer to an agency's interpretation of a statute, the majority upholds the board's orders because "the board adopted a reasonable and practical approach for determining when an amendment is necessary for purposes of R.C. 4906.20 and 4906.201." Majority opinion at ¶ 23. In other words, the majority defers to the board's interpretation of R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) rather than engaging in its own statutory interpretation or following our precedent. Regardless of its terminology, the majority's analysis fails.

**{¶ 73}** Our caselaw recognizes that we may rely on an agency's expertise in interpreting a law when "highly specialized issues" are involved and when "agency expertise would * * * be of assistance in discerning the presumed intent of

our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979). And we have recognized that "[d]ue deference should be given to statutory interpretations by an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility." *Weiss*, 90 Ohio St.3d at 17-18, 734 N.E.2d 775, citing *Collinsworth v. W. Elec. Co.*, 63 Ohio St.3d 268, 272, 586 N.E.2d 1071 (1992).

**{¶ 74}** But here, the issue before us is neither highly specialized nor one related to the board's enforcement responsibility. Rather, this case requires us to simply engage in a familiar function—statutory construction—in which we apply established principles. And because the interpretation of a statute is a question of law, we review the board's interpretation de novo and *without deference*. *Stewart v. Vivian*, 151 Ohio St.3d 574, 2017-Ohio-7526, 91 N.E.3d 716, ¶ 23. Not only does deferring to the board's construction of R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) abdicate our function and responsibility as members of the judiciary to "say what the law is," *Marbury*, 5 U.S. at 177, 2 L.Ed. 60, but we also "abandon our role as an independent check on the executive branch" when we defer to an administrative agency's interpretation of the law, *State ex rel. McCann v. Delaware Cty. Bd. of Elections*, 155 Ohio St.3d 14, 2018-Ohio-3342, 118 N.E.3d 224, ¶ 31 (DeWine, J., concurring in judgment only).

**{¶ 75}** In any case, "[t]o interpret what is already plain 'is not interpretation but legislation.' " *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 31, quoting *Iddings v. Jefferson Cty. School Dist. Bd. of Edn.*, 155 Ohio St. 287, 290, 98 N.E.2d 827 (1951). R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) are unambiguous, and the board's "interpretation" of these statutes is nothing more than policymaking in disguise. Rather than simply considering whether a project change requires an amendment to the certificate pursuant to the statutes, the board has instead adopted a case-by-case, cost-benefit analysis to decide when the new setbacks should apply to the amendment.

{¶ 76} In this case, for example, the board in its entry denying rehearing explained that applying the new setbacks based on a change in acceptable turbines "could result in a previously certificated wind farm project, wherein significant investment has been made over a span of years, to be irreparably impeded," Power Siting Bd. No. 15-1921-EL-BGA, 2017 Ohio PUC LEXIS 726, *16 (Aug. 17, 2017), even when "neighboring landowners would not experience adverse effects that have not already been contemplated and mitigated under the existing certificate," *id.* at *17. Essentially, the board concluded that the costs of applying the new setbacks to Greenwich Windpark's proposed wind farm outweighed the benefits, and for this reason, it determined that the change did not qualify as an amendment.

{¶ 77} But nothing in R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) grants the board that authority to decide on a case-by-case basis whether the new setbacks should apply. The legislature could have given the board that discretion to weigh the significance of an amendment, but it did not. Rather, the General Assembly—the ultimate arbiter of public policy of this state—provided in R.C. 4906.201(B)(2) that "[a]ny amendment made to an existing certificate * * * *shall* be subject to the setback provision." (Emphasis added.) "[A] court may not rewrite the plain and unambiguous language of a statute under the guise of statutory interpretation," *Pelletier*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, at ¶ 20, and neither may an administrative agency, *see Black Fork Wind Energy*, ___ Ohio St.3d ___, 2018-Ohio-5206, ___ N.E.3d ___, at ¶ 21 (declining to defer to the board's interpretation of an unambiguous statute). The majority's deference to the board's interpretation of R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) is unwarranted.

{¶ 78} In the last analysis, Greenwich Windpark expressly applied for an amendment to its certificate. It understood—or should have understood—that the amendment would be subject to the new setbacks pursuant to R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2), and the board properly followed the

required procedures for amending a certificate before granting that application. However, the board lacked discretion to decide that changing a certificate condition to add or substitute turbine models does not qualify as an amendment to the existing certificate or trigger the new setbacks. The board's orders are therefore unreasonable and unlawful.

**Conclusion**

{¶ 79} In H.B. 483, the General Assembly enacted more stringent setback requirements for wind farms. In doing so, it necessarily had to draw lines regarding when the new setbacks would apply. Recognizing that existing certificate holders and applicants had relied on the existing law in investing in wind-farm projects, it did not make the new setbacks applicable to applications made and certificates issued prior to the effective date of this legislation. But the legislature provided in R.C. 4906.20(B)(2)(b)(ii) and 4906.201(B)(2) that if an existing certificate holder chose to amend its certificate after the effective date of H.B. 483, it would be subjecting itself to the new setback provision.

{¶ 80} It is the function of the General Assembly to weigh competing policy concerns and draw lines in enacting legislation. *See Schwan v. Riverside Methodist Hosp.*, 6 Ohio St.3d 300, 302, 452 N.E.2d 1337 (1983). In contrast, our role "in reviewing legislative enactments is limited to interpreting the meaning of statutory provisions and determining whether they are in accord with the federal and state Constitutions." *Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, ¶ 31. Second-guessing the wisdom of the legislature's public-policy decisions does not fall within the scope of that review. *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20.

{¶ 81} The General Assembly's intent is manifest—the new setbacks enacted by H.B. 483 apply when a wind-farm certificate is amended to add or

substitute a new model of turbine for use on the project. The new setback provision therefore applies to the amendment of Greenwich Windpark's certificate.

**{¶ 82}** Accordingly, I would reverse the orders of the Power Siting Board.

DEWINE and STEWART, JJ., concur in the foregoing opinion.

———————————

McNees, Wallace & Nurick, L.L.C., and Matthew R. Pritchard, for appellant.

Dave Yost, Attorney General, William L. Wright, Section Chief, and Jodi J. Bair, Thomas G. Lindgren, and John H. Jones, Assistant Attorneys General, for appellee Ohio Power Siting Board.

Vorys, Sater, Seymour & Pease, L.L.P., Michael J. Settineri, and Daniel E. Shuey; Bricker & Eckler, L.L.P., Daniel C. Gibson, Anne Marie Sferra, Sally W. Bloomfield, Dylan F. Borchers, and Devin D. Parram, for intervening appellee, 6011 Greenwich Windpark, L.L.C.

Dickinson Wright, P.L.L.C., Jonathan R. Secrest, Christine M.T. Pirik, and William V. Vorys, urging affirmance for amicus curiae, Mid-Atlantic Renewable Energy Coalition.

———————————